UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

AVRAM VINETO NIKA,

    Petitioner,

      v.

WILLIAM GITTERE, *et al.*,

    Respondents.

Case No. 3:09-cv-00178-JCM-WGC

**ORDER**

Introduction

    This action is a petition for a writ of habeas corpus by Avram Vineto Nika, a Nevada prisoner sentenced to death. The case is fully briefed and before the Court for adjudication of the merits of the claims remaining in Nika's second amended habeas petition. Having considered the briefing and the exhibits submitted by the parties, the Court will grant Nika's petition in part and deny it in part. The Court will conditionally grant Nika habeas corpus relief regarding his death sentence, requiring the State to resentence Nika to a non-capital sentence or grant him with a new penalty-phase trial. The Court will deny Nika relief in all other respects, will grant Nika a certificate of appealability regarding certain claims on which relief is denied, and will deny Nika's motions for leave to conduct discovery and for an evidentiary hearing.

Background Facts and Procedural History

    Nika's conviction and death sentence result from the murder of Edward Smith, on August 26, 1994, on the side of a highway east of Reno. On Nika's direct appeal, the Nevada Supreme Court described the crime, as revealed by the evidence at trial, as follows:

Appellant Avram Nika ("Nika") left Aptos, California, where he lived with his wife Rodika, between noon and 1 p.m. on August 26, 1994, and was traveling to Chicago so that he could fly from there to Romania to visit his sick mother. Nika's car was full of clothes, tools, electronic items, and a small television. According to Rodika, Nika was from Romania and spoke fluent Serbo-Croatian, spoke almost fluent Romanian, and spoke only broken English. Rodika also stated that Nika did not speak colloquial English and that she had to be present when he had dealings with merchants, government officials, and other people. Nika was driving a brown Chrysler New Yorker, and testimony indicated that it takes approximately five and one-half hours to drive from Aptos to Reno. Nika's car broke down at mile marker 34, approximately twenty miles east of Reno.

Edward Smith ("Smith") was employed as a manager at a Burger King in Reno. Smith left work to go home at approximately 8 p.m. to 8:10 p.m. on August 26, 1994. The Smith family lived in Fallon, and Smith had made plans with his wife and child to attend a movie that started at approximately 9:45 p.m. Smith drove a silver 1983 BMW, and Mrs. Smith testified that the BMW often would not start, that they had to push start it, and that they had recently bought a new battery for the BMW in July 1994. Testimony indicated that it takes approximately one hour to one hour and fifteen minutes to get from the Burger King in Reno to the Smith's home in Fallon and that it takes approximately forty to forty-five minutes to get from the Burger King to mile marker 34.

Several people saw Nika standing by his car at mile marker 34 on August 26, 1994. [Footnote: Robbie Morrow stated that around 6:20 p.m. she noticed a "junky" looking brown Chrysler on the side of the road with the hood and trunk cover up. Morrow stated that she saw someone who appeared "dirty and grubby" in very short cut-off pants, a yellow tank top shirt, and white tennis shoes lying under the front of the car, apparently checking the engine. Robin Aguire, who was in prison at the time of trial on an unrelated drug charge, testified that she and her mother were driving on I-80 between 6 p.m. and 6:30 p.m. and saw a brown car with its hood up. She identified Nika as the man standing next to the car. Susan Tarbet stated that at approximately 7:20 p.m. or 7:25 p.m. she saw a man leaning against a brown car with his arms crossed. She also testified that she believed that the man she saw on the side of the road was Nika. Jewell Waters was following her husband home from Reno and passed mile marker 34 at approximately 7:30 p.m. Jewell saw the brown Chrysler and identified Nika as the person in the car. Michael Waters, Jewell's husband who was driving ahead of Jewell, also indicated that Nika was the man that he saw by the car.] Edward Sanchez was driving a maroon Nissan Sentra and was flagged down by Nika at approximately 7:45 p.m. Sanchez pulled his car in front of Nika's and backed up toward the brown Chrysler. Nika approached Sanchez's passenger window and said his car had broken down and that he needed help. Sanchez got out of his car and attempted to find out what was wrong with Nika's car. Sanchez stated that Nika had a thick accent, strong body odor, a day's beard growth and wore blue cut-off jeans. Sanchez offered to give Nika a ride, but Nika could not decide if he wanted to accept the ride and instead had Sanchez call a tow truck for him. Sanchez stated it was shortly after 8 p.m. when he got back into his car, perhaps 8:02 p.m. Sanchez stopped at a truck stop in Fernley and asked one of the clerks to call a tow truck for Nika.

Davina Boling was driving with her boyfriend on I-80 and saw the brown Chrysler on the side of the road around 8:30 p.m. They pulled over to help Nika, whom Boling described as looking frustrated, and Nika told them he had been there for three or four hours and needed a tow truck. They offered him a ride, which he declined, but he requested that they call a tow truck for him. As they left, Nika told them "Good-bye. Thank you, God bless."

Debra Fauvell ("Debra") stated that at approximately 8:40 p.m. she and her husband passed mile marker 34. She stated that she saw two cars on the side of the road, the first was a tan or light colored, four-door sedan which did not have any lights on and which had both driver's side doors open. About 150 feet in front (east) of the tan car she saw a dark brown sedan-type car with its hazard lights on. She saw two people standing by the first (most westerly) car. The person standing by the rear passenger side of the first car had a medium build, was about five feet ten inches tall, and was wearing a white T-shirt and light colored, faded jean-type pants. The second person was twenty feet in front of the first person, was bigger and had bushier hair than the first person, and was walking in a southeasterly direction away from the cars. Debra was shown a picture of Smith and stated that the second man's stature was consistent with Smith's. Daniel Fauvell, Debra's husband, testified that he was driving the car. He stated that he was focused on driving and did not see much, but the first car that they passed did not have any lights on, the second car had its hazard lights on, and one person was standing next to the first car.

Trooper Terry Whitehead of the Nevada Highway Patrol testified as follows. He came into contact with Nika while patrolling the highway on August 26, 1994. Whitehead was traveling westbound on I-80 when he saw a stranded BMW on the eastbound shoulder with its hazard lights on. He made a U-turn across the highway and went to help the stranded motorist. As Whitehead approached the BMW, he passed a brown Chrysler with no lights on. Because the Chrysler had no lights on, the hood was not open, and nobody was in the car, he drove further and pulled behind the BMW. The dispatch log indicates that he ran a license plate check on the BMW at 8:51 p.m. (the license plate was a Nevada plate), and he also looked at the BMW to see if it had indications that it was stolen. There were no people or items of personal property in the BMW. Because the dispatcher did not return his inquiry, he assumed that the BMW was not stolen and started to back up to check out the Chrysler, which was about 400 feet behind (west of) the BMW. As Whitehead backed up, he saw someone waving a flashlight from a southeasterly direction apparently trying to get his attention. The flashlight was coming from the area where Smith's dead body was found the next day. Whitehead got out of his car and asked Nika what was wrong wit his car; Nika pointed to the BMW and stated, "Everything's wrong with it." Whitehead asked Nika if he needed a ride. Nika declined and instead asked for a tow truck. Whitehead said he would call one and asked Nika if there was anything else he could do for him. Nika stated he could use a ride to Chicago. Whitehead stated he did not patrol that far. At 8:53 p.m. Whitehead requested a tow truck for Nika. Whitehead stated that Nika was wearing white high-top tennis shoes and did not seem more nervous than any other person who had been stranded at night on the side of the road. He also stated that he did not see any blood on Nika's shoes or fanny pack and that he never asked Nika his name. Whitehead left the scene at 8:56 p.m. to answer a call for back-up assistance on a DUI case.

Karl Younger testified for the defense. He stated that he worked for Anderson Towing and received a call at his home in Reno on August 26, 1994, at 8:45 p.m. requesting tow truck assistance at mile marker 34 for a Chrysler New Yorker. [Footnote: This call was apparently made by either Sanchez or Boling.] At approximately 9:15 p.m., Younger saw the Chrysler and backed up toward it to prepare to tow it, at which time he noticed two other cars about sixty yards in front of (east) the tow truck. The first car in front of Younger was a silver BMW with out-of-state license plates and its lights on. The second car, a blue or brown Nissan or Datsun which also had its lights on, was in front of the first car. As he backed up to the Chrysler, two people approached the tow truck and told him that the Chrysler needed oil, that they had taken the driver to town to get the oil, and that the tow truck was no longer needed. Neither of these two men spoke with a thick accent and both spoke perfect English. Younger also noticed five to seven other people with flashlights in the area where Smith's body was eventually found. Younger then left the scene.

Loni Kowalski testified that she worked at Hanneman's Tow Service and received a call at 8:53 p.m. from the Highway Patrol requesting a tow truck for a silver BMW. At 8:57 p.m. she called Jerry Turley, an employee who was on call but at his own home, to tell him to respond to the request. Turley testified that he drove west from Fernley toward mile marker 34, looking on both sides of the highway for the silver BMW. He did not see the BMW and called Kowalski to inform her of such. Kowalski told Turley to keep looking, and Turley eventually saw two cars on the eastbound shoulder, exited the freeway and re-entered going eastbound, and put his flashers on as he arrived at the two cars. He noticed that neither car was a silver BMW, turned his flashlights off, and called Kowalski at 9:49 p.m. to tell her that he could not find the BMW. Turley stated that one car was a large dark car that could have been a Chrysler and that the other car was a smaller domestic car, like a Mercury Monarch or Ford Granada, which had its flashers on. He saw two people standing by the Chrysler but could not describe them.

On August 27, 1994, Ray Hansen, a brakeman for Southern Pacific Railroad, noticed what he thought was a body lying next to the fence between the railroad tracks and I-80. The police were called, and a trooper found the body. Careflight was also called because it was first believed that a motorcycle accident had occurred and that medical attention was required. The Careflight helicopter landed approximately fifteen to fifty feet from the body, and the medics checked the body and discovered that the person was dead.

David Billau was the crime scene investigator. He stated that the Careflight helicopter which landed near the crime scene could have disturbed the crime scene. He described the crime scene as follows: the Chrysler was parked off the shoulder of the eastbound lane of I-80; south of the car was a small hillside; south of the hillside was a barbed wire fence under which Smith's body was dumped; and south of the fence and the body were the railroad tracks. Drag marks in the dirt extended from the Chrysler to where the body was found. By the Chrysler's rear passenger tire was a rock with pooled blood on it. By the front tire was an area of red stained dirt in which a bullet and human hair were found. A spent shell casing was found a few feet in front of the red stained dirt. Smith's body was found under the barbed wire fence and his pants were hanging from

the fence. His wallet was found with money still in it lying next to his body. Smith had been shot in the forehead.

The police traced the brown Chrysler to Avram Nika and an address in Chicago. On August 29, 1994, the Washoe County Sheriff's office called the Chicago police for assistance in locating Nika. Chicago Police Detective Tony Villardita and his partner discovered several addresses for Nika and attempted to locate him. They saw Nika exit a silver BMW, and when they asked him his name, Nika gave them a false name. Based on this information they arrested Nika for possession of a stolen vehicle and read him his *Miranda* rights. Nika apparently told the police that he understood his rights and that he would waive those rights and speak to them.

Nika first denied any knowledge of the BMW and said that he had walked to his house. When the police told him that they saw him in the car and that they had found the car key in his pocket, Nika said that the car belonged to his friend, but that he did not know his friend's name. The police then told Nika that the BMW was involved in a murder outside Reno. Nika said that he had left Aptos in his Chrysler, arrived in Reno at around 2 p.m., went to a casino to eat, and when he came out of the casino his car was gone but his license plates were still there. At that point three males pulled up and offered to sell the BMW to him for $300.00. He took the offer, put his plates on the car, and drove to Chicago. He also stated that he made no other stops in Reno and that the car had no mechanical problems.

The police then told Nika that the BMW was seen on the side of I-80, and Nika then said that the BMW had an oil and antifreeze problem about thirty miles east of Reno, several people stopped to help him, and he eventually got the car restarted. Nika said that he did not see his stolen Chrysler where the BMW broke down. The police told him that witnesses had seen both cars on the side of the road. Nika then told the police that he was "ready to tell the truth," and he said that he left the casino in his Chrysler and had car problems about thirty miles east of Reno. He said several people stopped to help him, and then the same three males he described earlier stopped to help him and offered to sell him the BMW for $300.00. He bought the car, changed the license plates, and loaded his personal property into the BMW. Nika also stated that just as he was ready to leave and while the three males were still at the scene, a police officer stopped to help him. Nika told the officer that the BMW was experiencing problems but that he was able to start it, and then he drove to Chicago. Nika also stated that he went to his mother-in-law's garage in Chicago to unload his personal property, drove to get something to eat, and then was arrested by Villardita and his partner. After this questioning was conducted, John Yaryan ("Yaryan"), the Washoe County Sheriff's deputy who had flown to Chicago, questioned Nika. However, the district judge suppressed this statement based on the fact that Nika had invoked his right to remain silent and his right to counsel and that Yaryan continued to question Nika at length. The State has not argued that the suppression was improper.

The police obtained consent to search the garage of Nika's mother-in-law. They found a fanny pack, tennis shoes, and blue denim cut-off jeans, all of which were tested by forensic investigators. The forensic investigators found blood spatter on all three items, and DNA testing

indicated that the blood was consistent with that of Smith and excluded Nika as a source. The forensic investigators stated that at a minimum, 1 in 8,800 people had the same DNA pattern they discovered.

Nika was extradited from Chicago to Reno and was booked into Washoe County jail on September 1, 1994. During Nika's incarceration, Nathanial Wilson ("Wilson"), an inmate at the Washoe County jail, befriended Nika. Wilson testified to statements made by Nika regarding the events on I-80. Specifically, Nika told Wilson that his car had broken down, a man stopped to help him, the man called him a "motherf-----," he hit the man in the head with a crowbar, and then shot him in the head. Nika stated that in Romania, his country of origin, you did not use the word "motherf-----," and that you could be killed for calling somebody that name. Nika stated that the victim was lying on the ground when he was shot in the head, that he tried to hide the body in some bushes, and that he killed the man because "he needed to get to Chicago." Nika stated that he hid the gun, which was an automatic pistol, about five miles from the crime scene. (The gun was never found despite an extensive search.) Nika told him that he had taken the battery out of his car and put it in the BMW because the BMW would not start. [Footnote: Evidence showed that when the BMW was found in Chicago, it had a "National" brand battery and that the battery purchased by the Smiths in July 1994 was not a National brand battery.]

Wilson was in jail on one count of selling cocaine and stated that he did not receive any deal from the prosecution in exchange for his testimony. However, Wilson spoke to the police for the first time on October 11, 1994, and was released from jail and granted probation on November 18, 1994, after pleading guilty to what he called "possession for sale," a lesser crime than that with which he was originally charged.

Dr. Anton Sohn ("Dr. Sohn") conducted the autopsy on Smith. He found three blunt trauma wounds on the back of Smith's head where Smith had been hit with an object heavy enough and with enough force to fracture the skull beneath each wound. Dr. Sohn testified that at least one of the blunt trauma wounds was delivered to the skull while Smith was lying on the ground face down. On Smith's forehead was a bullet wound which Dr. Sohn classified as a "contact wound," stating that it was created when the muzzle of the gun was placed directly against the forehead and the gun was fired. Dr. Sohn found an exit wound in the back of Smith's head and found other lacerations on Smith's face. Dr. Sohn found scrapes or "drag marks" on Smith's chest which were consistent with Smith's body being dragged in the dirt. Dr. Sohn stated that the gunshot to the head was the cause of death and that the blunt force traumas were inflicted before Smith was shot.

At the conclusion of the trial, the jury found Nika guilty of first degree murder with the use of a deadly weapon. At the penalty hearing, the prosecution sought the death penalty and alleged three aggravating circumstances as follows:

1. Evidence that the murder was committed by AVRAM NIKA during the commission of or attempt to commit a robbery. NRS 200.033(4).

2.  Evidence that the murder was committed to avoid or prevent a lawful arrest. NRS 200.033(5).

3.  Evidence that the murder was committed upon one or more persons at random and without apparent motive. NRS 200.033 (9).

Anna Boka ("Anna"), Nika's mother-in-law, testified at the penalty hearing as follows. Nika had a violent temper, and in 1991 when she did not give Nika money for a trip, he threatened to kill both her and Rodika, Anna's daughter and Nika's wife. Peter Boka ("Peter"), Anna's husband, told Anna that in September 1993 he and Nika had gotten into an argument and Nika put a gun to Peter's head. (Peter later testified that he never saw a gun and that Nika only threatened to shoot him.) Anna stated on cross-examination that Peter was a very heavy drinker and had instigated the fight in September 1993. In October 1993, Nika stated that he would kill Anna if Rodika did not come back to live with him. Also in October 1993, Nika wanted to see his and Rodika's baby who was staying at Anna's house, but Peter refused to allow Nika in the house. At that point Nika flashed a gun and told Anna that if Peter did not let him see the baby, he would kill Peter. Finally, in November 1993, Nika told Anna that if Rodika did not leave Anna's house in Chicago and come back to him, he would burn down Anna's house.

Mary Ellen Izzo testified that Nika had raped her in an apartment building in Chicago in December 1989. She stated that he was helping people move into or out of the building, that she met him in the hallway, and that he later told her that his mother, who was the manager of the apartment, wished to see her. [Footnote: The woman whom Izzo believed to be Nika's mother was in fact Nika's aunt. Apparently, Nika was the maintenance man in the apartment building.] She went into the manager's apartment with Nika and he locked the door and told her to come into the bedroom because that was where his mother was. When she was in the bedroom, Nika pushed her on the bed, hit her, and sexually penetrated her. Izzo escaped after Nika let her up, and she then called the police. Nika was never prosecuted for the alleged crime, and Izzo stated that she did not proceed with the prosecution because Nika's aunt threatened to evict her if she proceeded, she had three children to take care of, and she did not have enough money to move. Izzo stated on cross-examination that she had bruises on her face and breasts as a result of the rape; however, a hospital report indicated that she had only red marks on her neck. The defense attorney asked Izzo if she was a drug user, and Izzo stated that she was not. Izzo stated that shortly after this event she received government housing and moved.

Rodika, Nika's wife, testified for the defense as follows. In reference to the alleged sexual assault, Izzo had approached Rodika's family and stated that if they did not want to see Nika jailed for rape, they had better pay her some "big money." She had heard that Izzo had a drug problem and had hung her children out of her second story window. In reference to the September 1993 incident between Nika and Peter, the police were called, and they never found a gun. She acknowledged on cross-examination that Nika was violent and had made death threats against her and her family on several occasions.

Dorina Vukadin, Rodika's sister, also testified for the defense. She stated that Nika played sports with her children and that her children liked Nika, but she also stated that he was a stern disciplinarian.

On July 10, 1995, the jury found beyond a reasonable doubt that the murder committed by Nika was aggravated by the fact that the murder was committed upon Smith at random and without apparent motive. The jury also found that no mitigating circumstances existed. [Footnote: The mitigating circumstances offered to the jury were as follows:

1. The defendant has no significant history of prior criminal activity.

2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

3. The victim was a participant in the defendant's criminal conduct or consented to the act.

4. The defendant was an accomplice in a murder committed by another person and his participation in the murder was relatively minor.

5. The defendant acted under duress or under the domination of another person.

6. The youth of the defendant at the time of the crime.

7. Any other mitigating circumstance.]

Consequently, the mitigating circumstances did not outweigh the aggravating circumstances found; and therefore, a sentence of death was imposed.

Opinion, Respondents' Exh. 81, pp. 1-13 (ECF No. 111-5, pp. 2-14) (published as *Nika v. State*, 113 Nev. 1424, 951 P.2d 1047 (1997)).

Nika appealed. On August 23, 1995, the Nevada Supreme Court ordered that "the effectiveness of trial counsel should be reviewed on direct appeal," and referred the matter to the state district court for further proceedings. *See* Order, Respondents' Exh. 60 (ECF No. 109-9). On November 7 and 8, 1996, the state district court held an evidentiary hearing regarding the issue whether Nika received effective assistance of trial counsel. *See* Transcript of Proceedings, Respondents' Exhs. 76, 77 (ECF Nos. 110-1, 111-1). The state district court ruled that Nika did not receive ineffective assistance of trial counsel and ordered the record of those proceedings transmitted to

8

the Nevada Supreme Court. *See* Transcript of Proceedings, Respondents' Exh. 77, pp. 99-117 (ECF No. 111-1, pp. 100-18). On December 30, 1997, the Nevada Supreme Court affirmed the judgment of conviction and sentence. *See Nika v. State*, 113 Nev. 1424, 951 P.2d 1047 (1997). On that date, the Nevada Supreme Court also dismissed Nika's separate appeal from the district court's ruling that he did not receive ineffective assistance of trial counsel. *See* Order Dismissing Appeal, Respondents' Exh. 82 (ECF No. 112-1).

On April 15, 1998, Nika filed a petition for writ of habeas corpus in the state district court. *See* Petition for Writ of Habeas Corpus, Respondents' Exh. 86 (ECF No. 112-5). Counsel was appointed, and, with counsel, Nika filed a supplement to his petition on September 29, 2000. *See* Supplement to Petition for Writ of Habeas Corpus, Respondents' Exh. 99 (ECF No. 113-1). The state district court dismissed all but one of Nika's claims, and, following an evidentiary hearing, denied relief on the remaining claim. *See* Order filed March 15, 2001, Respondents' Exh. 107 (ECF No. 114-8); Transcript of Proceedings, Respondents' Exhs. 122, 123 (ECF Nos. 116-12, 117-1); Order Denying Petition for Post-Conviction, Respondents' Exh. 125 (ECF No. 117-3); Findings of Fact, Conclusions of Law and Judgment, Respondents' Exh. 129 (ECF No. 117-7).

Nika appealed, and on September 16, 2004, the Nevada Supreme Court reversed and remanded the case to the state district court for further proceedings on the claims that had been dismissed. *See* Opinion, Respondents' Exh. 141 (ECF No. 118-9) (published as *Nika v. State*, 120 Nev. 600, 97 P.3d 1140 (2004)). The Nevada Supreme Court ruled that the proceeding regarding issues of alleged ineffective assistance of counsel in conjunction with Nika's direct appeal had been an inadequate forum to adjudicate those issues. *See Nika*, 120 Nev. at 602, 97 P.3d at 1142. The Nevada Supreme Court affirmed the state district court's denial of relief on the remaining claim. *See id.*, 120 Nev. at 607-11, 97 P.3d at 1145-48.

On remand, Nika filed a second supplemental habeas petition on June 23, 2005. *See* Second Supplemental Petition for Writ of Habeas Corpus, Respondents' Exh. 146 (ECF No. 119-1). On January 6, 2006, the state district court filed an order denying Nika relief on the remanded claims. *See* Order Granting Motion to Dismiss, Respondents' Exh. 150 (ECF No. 120-3). Nika again appealed, and the Nevada Supreme Court affirmed on December 31, 2008. *See* Opinion, Respondents' Exh. 165 (ECF No. 122-1) (published as *Nika v. State*, 124 Nev. 1272, 198 P.3d 839 (2008)). Nika then petitioned the United States Supreme Court for certiorari, and his certiorari petition was denied on October 13, 2009. *See* Notice of Denial of Petition for Writ of Certiorari, Respondents' Exh. 172 (ECF No. 122-8).

Nika initiated this federal habeas corpus action on April 7, 2009, and counsel was appointed (ECF Nos. 1, 11). With counsel, Nika filed an amended habeas petition on March 1, 2010 (ECF No. 18).

On April 30, 2010, Respondents filed a motion to dismiss (ECF No. 41). Nika then filed a motion for stay (ECF No. 42). On August 27, 2010, the Court granted Nika's motion for stay, stayed this case pending Nika's further exhaustion of claims in state court, and denied the motion to dismiss as moot (ECF No. 47).

On April 20, 2010, Nika filed a second state-court petition for a writ of habeas corpus. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Respondents' Exh. 174 (ECF No. 123-1). On November 2, 2011, the state district court dismissed the petition. *See* Order, Respondents' Exh. 190 (ECF No. 124-10). Nika appealed, and on July 30, 2014, the Nevada Supreme Court affirmed. *See* Order of Affirmance, Respondents' Exh. 196 (ECF No. 125-4). The Nevada Supreme Court denied Nika's petition for rehearing on October 23, 2014. *See* Order Denying Rehearing, Respondents' Exh. 200 (ECF No. 125-8). Nika petitioned the United States Supreme Court for certiorari, and that petition was denied on April 27, 2015. *See* Notice of Denial of Petition for Writ of Certiorari, Respondents' Exh. 204 (ECF No. 125-12).

On May 29, 2015, Nika moved to lift the stay of this case (ECF No. 62). The Court granted that motion and lifted the stay on June 18, 2015 (ECF No. 68).

On August 3, 2015, with leave of court, the Republic of Serbia filed a brief, as amicus curiae, in support of Nika's petition (ECF Nos. 69, 72, 84).

Also on August 3, 2015, Nika filed a second amended petition for writ of habeas corpus (ECF No. 73), which is now Nika's operative petition. Nika's second amended petition asserts the following grounds for relief:

> 1. Nika's federal constitutional rights were violated as a result of ineffective assistance of his trial counsel.
>
>> A. "The county contract under which trial counsel were paid created a conflict of interest that prevented trial counsel from performing effectively."
>>
>> B. "Trial counsel were ineffective for failing to investigate and present compelling evidence of Mr. Nika's background, culture, and life history."
>>
>> C. "Trial counsel were ineffective in litigating the motion to suppress Mr. Nika's statements to police."
>>
>> D. "Trial counsel were ineffective for failing to conduct adequate voir dire."
>>
>> E. "Trial counsel were ineffective for failing to move for a change of venue."
>>
>> F. "Trial counsel were ineffective throughout the guilt phase of Mr. Nika's trial."
>>
>>> 1. "Trial counsel were ineffective for failing to investigate and present an argument that Mr. Nika was provoked and acted in the heat of passion, or in self-defense."
>>>
>>> 2. "Trial counsel were ineffective for failing to investigate and present evidence that Nathaniel Wilson was acting as an agent of the State, and received benefits in exchange for his testimony."
>>>
>>> 3. "Trial counsel were ineffective during their opening arguments."
>>>
>>> 4. "Trial counsel were ineffective for waiving spousal privilege."

> 5. "Trial counsel were ineffective for failing to object to unrecorded bench conferences."
>
> 6. "Trial counsel were ineffective for failing to object to improper jury instructions."
>
> 7. "Trial counsel were ineffective during their closing arguments."
>
> G. "Trial counsel were ineffective for failing to investigate and present powerful mitigating evidence at the penalty phase of the trial."
>
> H. "Trial counsel were ineffective throughout the trial proceedings."

2. Nika's federal constitutional rights were violated "because the guilt phase jury instructions failed to require the jury to find all of the mens rea elements of first-degree murder."

3. Nika's federal constitutional rights were violated "due to the jury's finding the statutory aggravating circumstance that the murder was committed at random and without apparent motive, which is facially unconstitutional and invalid as applied to Mr. Nika."

4. Nika's federal constitutional rights were violated "due to the State's actions in actively concealing the executory promise of benefits it made to Nathaniel Wilson, in allowing false testimony in that regard, and in convincing a defense witness that her testimony was no longer needed."

> A. "The State committed misconduct by failing to disclose an executory promise of benefits made to witness Nathanial Wilson."
>
> B. "The State committed misconduct by preventing the defense from calling Samantha McKendall."

5. Nika's federal constitutional rights were violated "due to the improper admission of Mr. Nika's custodial incriminating statements in violation of *Miranda v. Arizona.*"

6. Nika's federal constitutional rights, and his rights under an international treaty and international law, were violated because "[t]he State of Nevada and Mr. Nika's trial counsel failed to inform Mr. Nika that he had a right under Article 36 of the Vienna Convention on Consular Relations to notify Serbian consular officials of his arrest and detention."

7. Nika's federal constitutional rights were violated "because the trial court gave the jury erroneous and unconstitutional jury instructions during Mr. Nika's trial."

> A. The jury instructions "fail[ed] to require that the jury find the statutory aggravation is not outweighed by mitigation beyond a reasonable doubt."

B.     The jury instructions "fail[ed] to instruct the jury that aggravating circumstances needed to be found unanimously, and that mitigating circumstances did not need to be found unanimously."

C.     "The reasonable doubt instruction was unconstitutional."

D.     "The malice instructions were unconstitutional."

E.     "The trial court unconstitutionally instructed the jury on 'guilt' and 'innocence.'"

F.     The jury instruction regarding commutation violated Nika's federal constitutional rights.

G.     "The 'anti-sympathy' instruction was unconstitutional."

H.     The cumulative effect of the erroneous jury instructions resulted in a violation of Nika's federal constitutional rights.

8.     Nika's federal constitutional rights were violated "due to the trial court's improper, repeated ex parte contacts with the State regarding an executory promise of benefits to State's witness Nathanial Wilson."

9.     Nika's federal constitutional rights were violated as a result of prosecutorial misconduct.

A.     "The State made several improper arguments during Mr. Nika's trial."

B.     "The State improperly used its peremptory challenges to remove persons from the venire on the basis of gender."

C.     "The State asked improper questions and made improper comments during voir dire."

10.     Nika's federal constitutional rights were violated as a result of "the undue influence of publicity on Mr. Nika's trial."

11.     Nika's federal constitutional rights were violated "because Mr. Nika's capital trial and sentencing and review on direct appeal were conducted before state judicial officers whose tenure in office was not during good behavior but whose tenure was dependent on popular election, and who failed to conduct fair and adequate appellate review."

12.     Nika's federal constitutional rights were violated "because Mr. Nika's direct appeal counsel were ineffective."

13.     Nika's federal constitutional rights were violated as a result of the cumulative effect of the errors Nika alleges.

14.     Nika's death sentence is in violation of the federal constitution "because Nevada's lethal injection scheme constitutes cruel and unusual punishment."

Second Amended Petition (ECF No. 73), pp. 9-196 (capitalization and punctuation altered in quotations of headings).

On May 12, 2016, Respondents filed a motion to dismiss Nika's second amended petition (ECF No. 95). The Court granted that motion in part, and denied it in part, on March 16, 2017; the Court dismissed Grounds 7A, 7C, 7E, 7F, 7G, 10 and 11 of Nika's second amended petition. *See* Order entered March 16, 2017 (ECF No. 151).

The respondents filed an answer, responding to Nika's remaining claims, on October 20, 2017 (ECF No. 160). Nika filed a reply to the answer on March 26, 2018 (ECF No. 169). Respondents filed a response to Nika's reply on September 14, 2018 (ECF No. 181).

Along with his reply, on March 26, 2018, Nika also filed a motion for discovery (ECF No. 166) and a motion for an evidentiary hearing (ECF No. 168). Respondents filed an opposition to both of those motions on April 9, 2018 (ECF No. 172). Nika replied on October 4, 2018 (ECF No. 183).

Discussion

Standard of Review

Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir. 2000), overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63 (2003).

28 U.S.C. § 2254(d) sets forth the primary standard of review under the AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (*quoting Williams*, 529 U.S. at 409). The analysis under section 2254(d) looks to the law that was clearly established by United States Supreme Court precedent at the time of the state court's decision. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has also instructed that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (AEDPA standard is "a difficult to meet and highly deferential standard for evaluating state-court rulings, which

demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

The state courts' "last reasoned decision" is the ruling subject to section 2254(d) review. *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). If the last reasoned state-court decision adopts or substantially incorporates the reasoning from a previous state-court decision, a federal habeas court may consider both decisions to ascertain the state courts' reasoning. *See Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).

If the state court denies a claim but provides no explanation for its ruling, the federal court still affords the ruling the deference mandated by section 2254(d); in such a case, the petitioner is entitled to habeas relief only if "there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

In considering the petitioner's claims under section 2254(d), the federal court generally takes into account only the evidence presented in state court. *Pinholster*, 563 U.S. at 185-87. However, if the petitioner meets the standard imposed by section 2254(d), the federal court may then allow factual development, possibly including an evidentiary hearing, and the federal court's review is then de novo. *See Panetti v. Quarterman*, 551 U.S. 930, 948 (2007); *Wiggins*, 539 U.S. at 528-29; *Runningeagle v. Ryan*, 686 F.3d 758, 786-88 (9th Cir. 2012).

The federal court's review is de novo for claims not adjudicated on their merits by the state courts. *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

Procedural Default and *Martinez*

In *Coleman v. Thompson*, the Supreme Court held that a state prisoner who fails to comply with the state's procedural requirements in presenting his claims is barred by the adequate and independent state ground doctrine from obtaining a writ of habeas corpus in federal court. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991) ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas

petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance."). Where such a procedural default constitutes an adequate and independent state ground for denial of habeas corpus, the default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Murray*, 477 U.S. at 488. For cause to exist, the external impediment must have prevented the petitioner from raising the claim. *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991). With respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989), citing *United States v. Frady*, 456 U.S. 152, 170 (1982).

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court ruled that ineffective assistance of post-conviction counsel may serve as cause to overcome the procedural default of a claim of ineffective assistance of trial counsel. The *Coleman* Court had held that the absence or ineffective assistance of state post-conviction counsel generally could not establish cause to excuse a procedural default because there is no constitutional right to counsel in state post-conviction proceedings. *See Coleman*, 501 U.S. at 752-54. In *Martinez*, however, the Supreme Court established an equitable exception, holding that the absence or ineffective assistance of counsel at an initial-review collateral proceeding may establish cause to excuse a petitioner's procedural default of substantial claims of ineffective assistance of trial counsel. *See Martinez*, 566 U.S. at 9. The Court described "initial-review collateral proceedings" as "collateral

17

proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Id.* at 8.

In the March 16, 2017, order, the Court recognized that Nika raised certain of his claims—Grounds 1A, 1C, 1D, 1E, 1F3, 1F4, 1F5, 1H, 4B, 6, 9A, 9B and 12—for the first time in his second state habeas action, and the Nevada Supreme Court ruled that those claims were procedurally barred and that Nika did not make any showing to overcome the procedural bar. *See* Order entered March 16, 2017 (ECF No. 151), pp. 7-8. The Court ruled further that, under *Martinez*, Nika might be able to overcome the procedural default of those claims but declined to rule on the question of the procedural defaults until the merits of the claims were briefed. *See id.* at 8.

Respondents argue that *Martinez* does not provide a means for Nika to overcome any procedural default that results from the state courts' application of the state-law statute of limitations. *See* Answer (ECF No. 160), pp. 9-10. This argument is without merit. Nika was represented by his first state post-conviction counsel from 1998 until 2009; he filed his second state-court petition for a writ of habeas corpus on April 20, 2010. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Respondents' Exh. 174 (ECF No. 123-1). In this Court's view, under the circumstances in this case, ineffective assistance of Nika's first state post-conviction counsel may operate as cause to excuse his procedural defaults based on the state-law statute of limitations. Respondents do not articulate any compelling reason why the equitable rule of *Martinez* should not apply here.

With respect to Nika's claims of ineffective assistance of appellate counsel in Ground 12, Respondents point out that at the time of the March 16, 2017, order in this case, the Ninth Circuit Court of Appeals had, in *Nguyen v. Curry*, 736 F.3d 1287 (9th Cir. 2013), extended the *Martinez* exception to claims of ineffective assistance of direct appeal counsel, but *Nguyen* has since been abrogated by the Supreme Court, in *Davila v. Davis*, 137 S. Ct. 2058 (2017). *See* Answer (ECF No. 160), p. 54. Respondents' argument in this regard is well-taken; *Nguyen* is no longer good law.

Therefore, Nika's claims of ineffective assistance of appellate counsel are procedurally

defaulted, without any showing of cause and prejudice by Nika. In his reply, Nika argues

that, in his first state habeas action, he asserted certain claims of ineffective assistance

of appellate counsel, and the Nevada Supreme Court denied those claims on their

merits, so those parts of Ground 12 are not procedurally defaulted. *See* Reply (ECF No.

169), pp. 274-75; *see also Nika*, 124 Nev. at 1293, 1295-98, 198 P.3d at 853, 855-57.

This argument, however, is inconsistent with the argument Nika made regarding

Ground 12 in response to the respondents' motion to dismiss. There, Nika argued:

> The State argues that portions of Claim Twelve are procedurally defaulted,
> while other portions are not, without identifying which is which. ECF No.
> 95 at 59-60. As with Claim One, Nika's position is that his claim of IAC of
> direct appeal counsel is a single claim, and that the new factual
> allegations raised in the instant claim fundamentally alter the claim so as
> to render it new and different.

Opposition to Respondents' Motion to Dismiss (ECF No. 132), p. 94. The Court

accepted Nika's position, and treated Ground 12 as different from the claim in his first

state habeas action, and subject, in whole, to the procedural default doctrine in this

case. The case then proceeded, and the respondents answered, based on Nika's

position and the Court's ruling. Nika's attempt to change his position in this manner now

is barred by the doctrine of judicial estoppel. *See Russell v. Rolfs*, 893 F.2d 1033, 1037

(9th Cir. 1990). Ground 12 is procedurally defaulted, and Nika makes no showing to

overcome the procedural default. Ground 12 will be denied as barred by the procedural

default doctrine.

Nika's remaining claims for ineffective assistance of trial counsel are addressed

below.

Claims Warranting Habeas Corpus Relief

*Ground 7B - Jury Instructions and Verdict Forms Concerning
Mitigating Circumstances*

In Ground 7B, Nika claims that his federal constitutional rights were violated in

the penalty phase of his trial because the jury instructions "fail[ed] to instruct the jury

that aggravating circumstances needed to be found unanimously, and that mitigating circumstances did not need to be found unanimously." *See* Second Amended Petition (ECF No. 73), pp. 152-53. The crux of this claim is that in the penalty phase of Nika's trial, the jury instructions and verdict form did not inform the jury that they did not have to find mitigating circumstances unanimously, that is, that each juror could individually consider any mitigating circumstance whether or not any other jurors agreed about the existence of that mitigating circumstance.

Regarding the findings the jury was to make in the penalty phase of Nika's trial, the trial court instructed the jury as follows:

> The State has alleged certain aggravating circumstances are present in this case.

> The defendant has alleged certain mitigating circumstances are present in this case.

> It shall be your duty to determine:

> (a)  whether an aggravating circumstance or circumstances has/have been proven beyond a reasonable doubt;

> (b)  whether a mitigating circumstance or circumstances are found to exist; and,

> (c)  based upon these findings, whether the defendant should be sentenced to life imprisonment or death.

> The jury may impose a sentence of death only if you find at least one aggravating circumstance and further find there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.

> Otherwise the punishment imposed shall be imprisonment in the Nevada State Prison for life with or without the possibility of parole.

> *     *     *

> The State has the burden of proving beyond a reasonable doubt the aggravating circumstance or circumstances in this case.

> A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt, to be reasonable, must be actual, not mere possibility or speculation.

If you have a reasonable doubt as to the aggravating circumstance or circumstances in this case, or find the mitigating circumstance or circumstances are sufficient to outweigh the aggravating circumstance or circumstances found, the defendant is entitled to a verdict of life imprisonment and you are to specify whether such imprisonment shall be with or without the possibility of parole.

*   *   *

When you retire to consider your verdict, you must first determine whether the State has proven beyond a reasonable doubt that an aggravating circumstance or circumstances exist in this case and whether a mitigating circumstance or circumstances exist in this case. A verdict form has been provided to you for this purpose.

Based upon your findings in the verdict you must then determine whether the defendant should be sentenced to life imprisonment or death. If you determine life imprisonment is a proper verdict in this case, you must determine whether the imprisonment shall be with the possibility of parole or without the possibility of parole.

During your deliberations, you will have all the exhibits which were admitted into evidence during the trial and during this hearing, these written instructions and forms of verdict which have been prepared for your convenience.

Your verdict must be unanimous. As soon as you have agreed upon a verdict, have it signed and dated by your foreperson and return with it to this room.

Penalty Phase Jury Instructions, Respondents' Exh. 48, Instructions No. 10, 11 and 20 (ECF No. 108-3, pp. 11, 12 and 21). The verdict form provided to the jury was as follows:

We the jury in the above-entitled action, find beyond a reasonable doubt that the murder committed by the defendant was aggravated by the following circumstance or circumstances which have been checked below.

____ (1) The murder of Edward V. Smith was committed by defendant Avaram Nika while he was engaged in the commission of or an attempt to commit robbery and Avaram Nika killed Edward V. Smith.

____ (2) The murder of Edward V. Smith was committed to avoid or prevent a lawful arrest.

____ (3) The murder was committed upon Edward V. Smith at random and without apparent motive.

We, the jury in the above-entitled action find the following mitigating circumstance or circumstances which are existing in this case and have checked the same below.

_____ 1. The defendant has no significant history of prior criminal activity.

_____ 2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

_____ 3. The victim was a participant in the defendant's criminal conduct or consented to the act.

_____ 4. The defendant was an accomplice in a murder committed by another person and his participation in the murder was relatively minor.

_____ 5. The defendant acted under duress or under the domination of another person.

_____ 6. The youth of the defendant at the time of the crime.

_____ 7. Any other mitigating circumstance.


_____
FOREMAN


## LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE

We, the jury in the above-entitled action, having found the defendant, Avram Nika, guilty of Murder in the First Degree With The Use Of a Deadly weapon, set the penalty to be imposed at life in the Nevada State Prison without the possibility of parole, plus a consecutive term of life in the Nevada State Prison without the possibility of parole for the use of a deadly weapon.

DATED this ____ day of _____, 1995.


_____
FOREMAN


## LIFE IMPRISONMENT WITH THE POSSIBILITY OF PAROLE

We, the jury in the above-entitled action, having previously found the defendant, Avram Nika, guilty of Murder in the First Degree With The Use Of a Deadly Weapon, set the penalty to be imposed at life in the Nevada State Prison with the possibility of parole, plus a consecutive term of life in the Nevada State Prison with the possibility of parole for the use of a deadly weapon.

DATED this ____ day of _____, 1995.

_____

FOREMAN

DEATH PENALTY

     We, the jury in the above-entitled action, having previously found the defendant, Avram Nika, guilty of Murder in the First Degree With The Use Of a Deadly Weapon, and having found beyond a reasonable doubt that an aggravating circumstance or circumstances exists in this case and that any mitigating circumstance or circumstances are not sufficient to outweigh the aggravating circumstance or circumstances found, therefore, by reason thereof, set the penalty of sentence to be imposed upon the defendant, of Murder in the First Degree With The Use Of a Deadly Weapon at death.

     DATED this ___ day of _____, 1995.


_____

FOREMAN

Verdict, Respondents' Exh. 50 (ECF No. 108-5).

     In *Mills v. Maryland*, 486 U.S. 367 (1988), the Supreme Court held there to be a federal constitutional violation where "there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills*, 486 U.S. at 384; *see also McKoy v. North Carolina*, 494 U.S. 433, 442-43 (1990) ("*Mills* requires that each juror be permitted to consider and give effect to ... all mitigating evidence in deciding ... whether aggravating circumstances outweigh mitigating circumstances...."). The *Mills* Court based its ruling, in part, on the observation that "[n]o instruction was given indicating what the jury should do if some but not all of the jurors were willing to recognize something about petitioner, his background, or the circumstances of the crime, as a mitigating factor." *Mills*, 486 U.S. at 379. The *Mills* Court relied on a line of Supreme Court precedent holding that "the sentencer [may] not be precluded from considering, *as a mitigating*

23

*factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 374-75 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982), and *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion)) (emphasis in original). The Court acknowledged that it could not be certain that the jury in the *Mills* case interpreted the instructions to preclude consideration of mitigating factors unless they were found unanimously, but ruled that "[t]he possibility that a single juror could block" consideration of mitigating evidence "is one we dare not risk." *Mills*, 486 U.S. at 384. The Court stated: "Unless we can rule out the substantial possibility that the jury may have rested its verdict on the 'improper' ground, we must remand for resentencing." *Id.* at 377.

Nika asserted this claim in his first state habeas action. *See* Second Supplemental Petition for Writ of Habeas Corpus, Respondents' Exh. 146, pp. 137-44 (ECF No. 119-1, pp. 138-45). The state district court's ruling on the claim—apparently focusing on a related claim of ineffective assistance of trial counsel—was, in its entirety, as follows:

> Claim #16 deals with the subject of failure to request a specific instruction on the unanimity of a verdict on aggravating and mitigating circumstances. Nika has failed to specify how this claim would entitle him to any relief. It is therefore rejected.

Order Granting Motion to Dismiss, Respondents' Exh. 150, p. 3 (ECF No. 120-3, p. 4). Nika appealed and raised this issue in the Nevada Supreme Court. *See* Appellant's Opening Brief, Respondents' Exh. 152, pp. 4, 15-19 (ECF No. 120-5, pp. 23, 34-38). The Nevada Supreme Court denied relief on Nika's claim— focusing its discussion on a related claim of ineffective assistance of appellate counsel—as follows:

> Nika contends that the district court erred by dismissing his claim that appellate counsel was ineffective for failing to challenge the district court's refusal to give the jury his proffered instruction regarding mitigating circumstances. In particular, he argues that the jury instructions given failed to advise the jury that while it must agree unanimously on the existence of aggravating circumstances, it did not have to agree unanimously on the existence of mitigating circumstances. Nika is

correct—the specific instructions informing the jury about its findings and weighing of aggravating and mitigating circumstances did not expressly state that aggravating circumstances had to be found unanimously and that mitigating circumstances did not. Nika asserts that appellate counsel should have challenged the omission of this instruction pursuant to *Mills v. Maryland* [footnote: 486 U.S. 367 (1988)] and argued that the failure to instruct constituted plain error. We disagree.

Nika's reliance on *Mills* is misplaced. In that case, the United States Supreme Court concluded that a substantial probability existed that in an attempt to complete the verdict form as instructed, the jury believed that it could not consider any mitigating evidence unless it unanimously found the existence of a particular mitigating circumstance. [Footnote: *Id.* at 377-80.] Such is not the case here. Nika's jury was instructed that it had to find the existence of any aggravator beyond a reasonable doubt and its verdict must be unanimous. Further, the verdict form began with language—"[w]e, the jury"—that, as this court concluded in *Geary v. State*, a reasonable jury would understand "required a unanimous finding of the aggravating circumstances." [Footnote: 114 Nev. 100, 105, 952 P.2d 431, 433 (1998).] And no instruction placed constraints on the jury's ability to find mitigating circumstances. As this court has held in similar circumstances, the failure to adequately instruct the jury on unanimity may be harmless where the jury is informed that aggravating circumstances must be unanimously found beyond a reasonable doubt and no constraints are placed on the jury's ability to find mitigating circumstances. [Footnote: *Jimenez v. State*, 112 Nev. 610, 624-25, 918 P.2d 687, 695-96 (1996); *see Geary*, 114 Nev. at 104-05, 952 P.2d at 433.] On this basis, Nika failed to demonstrate that this instructional error would have had a reasonable probability of success on appeal. Therefore, the district court did not err by summarily dismissing this claim.

[Footnote: To the extent Nika argues that trial counsel were ineffective for not requesting his proposed instruction, we conclude that he failed to adequately substantiate his claim that trial counsel's performance was deficient or resulted in prejudice. *Strickland*, 466 U.S. at 687; *Kirksey*, 112 Nev. at 987, 923 P.2d at 1107. Therefore, the district court did not err by summarily dismissing this claim.]

*Nika*, 124 Nev. at 1297-98, 198 P.3d at 856-57. Two justices dissented from this ruling, as follows:

... I believe that appellate counsel was ineffective for failing to challenge the district court's refusal to give a proffered instruction advising the jury that it did not have to agree unanimously on the existence of mitigating circumstances. Without that instruction, the jury was left to presume that it could not consider any mitigating evidence unless it unanimously found the existence of a particular mitigating circumstance. Such a presumption is clearly contrary to law [footnote: *Jimenez v. State*, 112 Nev. 610, 624-25, 918 P.2d 687, 695-96 (1996)] and prejudicial.

*Id.*, 124 Nev. at 1302, 198 P.2d at 860 (Cherry, J., with whom Saitta, J., agreed, concurring in part and dissenting in part).

The Nevada Supreme Court focused its discussion on a claim of ineffective assistance of appellate counsel, and briefly discussed Nika's claim of ineffective assistance of trial counsel in a footnote; the court denied Nika's claim of trial court error without any discussion of that claim specifically. When a state supreme court denies a claim without explanation, the federal court still affords the ruling the deference mandated by section 2254(d); in such a case, the petitioner is entitled to habeas relief only if "there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

The Nevada Supreme Court's ruling was unreasonable, with respect to both the determination of the facts in light of the evidence and the application of *Mills*. It was an unreasonable determination of the facts to conclude that "no instruction placed constraints on the jury's ability to find mitigating circumstances." *See Nika*, 124 Nev. at 1297, 198 P.3d at 856. And, it was an unreasonable application of *Mills* for the Nevada Supreme Court to conclude that this case is different from *Mills* because no "substantial probability existed that in an attempt to complete the verdict form as instructed, the jury believed that it could not consider any mitigating evidence unless it unanimously found the existence of a particular mitigating circumstance." *See id.* Given the language of the relevant jury instructions and the verdict forms, and the clear directive of *Mills*, this Court sees no reasonable basis for the state court to deny Nika relief on this claim.

In this case, on the same page of the jury instructions stating that the jury was to determine "whether a mitigating circumstance or circumstances exist," the jury was instructed: "Your verdict must be unanimous." Penalty Phase Jury Instructions, Respondents' Exh. 48, Instruction No. 20 (ECF No. 108-3, p. 21). This jury instruction, Instruction Number 20, left no room for the jurors to surmise that they could individually consider mitigating circumstances not found unanimously. Neither Instruction Number 20 nor any other instruction clarified this for the jury. *See Geary v. State*, 114 Nev. 100, 105, 952 P.2d 431, 433 (1998) (in a case decided after Nika's conviction was final, setting forth jury instructions to be used in Nevada in capital cases to avoid *Mills* error).

26

Furthermore, Instruction Number 20 referred the jurors to the verdict form: "A verdict form has been provided to you for this purpose." Penalty Phase Jury Instructions, Respondents' Exh. 48, Instruction No. 20 (ECF No. 108-3, p. 21). Then, on the verdict form, there was a section where the foreman of the jury was to place a checkmark next to the listed mitigating circumstances found by the jury. There, the verdict form stated: "We, the jury in the above-entitled action find the following mitigating circumstance or circumstances which are existing in this case and have checked the same below." Verdict, Respondents' Exh. 50, p. 2 (ECF No. 108-5, p. 3). It is an inescapable conclusion that the jurors must have understood that as an instruction to identify mitigating circumstances that the jury unanimously agreed upon, and that they were to weigh against the aggravating circumstance. It is unimaginable that the jurors could have understood the verdict form to call for a listing of mitigating circumstances found by any jurors, individually, and weighed against the aggravating circumstance by the jurors who found them; there is nothing in the jury instructions or verdict form to suggest such an unusual approach to completing that part of the verdict form.

In the *Geary* case, which was cited by the Nevada Supreme Court in its ruling in this case, the Nevada Supreme Court held that the jury was properly instructed that aggravating circumstances must be found unanimously; the Nevada Supreme Court concluded, in that case, "that after having been instructed that its verdict must be unanimous, a reasonable jury would properly understand that the phrase '[w]e, the jury' required a unanimous finding of the aggravating circumstances." *Geary*, 114 Nev. at 104-05, 952 P.2d at 433. That reasoning applies just as well to the section of the verdict form in this case calling for the jury to identify the mitigating circumstances that they found.

Respondents cite *Smith v. Spisak*, 558 U.S. 139 (2010), a case in which the Supreme Court held that the jury instructions and verdict forms did not unconstitutionally require the jury to consider only mitigating circumstances found unanimously. *See* Answer (ECF No. 160), pp. 109-10. Respondents argue that in this case, as in *Spisak*,

there is no reasonable probability that the jury was led to believe that it could consider only mitigating circumstances found unanimously. *See id.* In *Spisak*, though, the jury instructions, and especially the verdict forms, were materially different from those in this case. In *Spisak*, there was no indication in the jury instructions that mitigating circumstances had to be found unanimously. *See Spisak*, 558 U.S. at 145-48. And, perhaps most importantly, the verdict forms provided to the jury in *Spisak* did not call for the jury—"we the jury"—to identify the mitigating circumstances that they found. *See id.*

This Court concludes that the jury instructions and verdict forms used in this case violated Nika's rights under the Eighth and Fourteenth Amendments of the United States Constitution, by raising a substantial probability that reasonable jurors thought they were precluded from considering mitigating evidence unless all jurors agreed on the existence of a particular mitigating circumstance. There is no reasonable basis for the Nevada Supreme Court's denial of relief on this claim.

*Ground 1G - Trial Counsel's Mitigation Presentation*

In Ground 1G, Nika claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because "[t]rial counsel were ineffective for failing to investigate and present powerful mitigating evidence at the penalty phase of the trial." *See* Second Amended Petition (ECF No. 73), pp. 89-95.

Nika was originally required by the Nevada Supreme Court to litigate his claims of ineffective assistance of counsel while his direct appeal was pending. While Nika's direct appeal was pending, on August 23, 1995, the Nevada Supreme Court, invoking Nevada's former Supreme Court Rule 250(IV)(H), remanded Nika's case to the state district court "to determine the effectiveness of trial counsel." *See* Order, Respondents' Exh. 60 (ECF No. 109-9). The state district court held an evidentiary hearing, *see* Transcript of Proceedings, Respondents' Exhs. 76, 77 (ECF Nos. 110-1, 111-1), then ruled that Nika received effective assistance of trial counsel and ordered the record of those proceedings transmitted to the Nevada Supreme Court. *See* Transcript of Proceedings, Respondents' Exh. 77, pp. 99-117 (ECF No. 111-1, pp. 100-18). On

1    December 30, 1997, the Nevada Supreme Court dismissed Nika's appeal from the

2    district court's ruling that Nika received effective assistance of trial counsel. *See* Order

3    Dismissing Appeal, Respondents' Exh. 82 (ECF No. 112-1).

4         Subsequently, on Nika's first appeal in his first state habeas action, the Nevada

5    Supreme Court ruled that the proceeding regarding issues of alleged ineffective

6    assistance of counsel in conjunction with Nika's direct appeal "did not provide him with a

7    full and fair opportunity to raise claims of ineffective trial counsel." *Nika*, 120 Nev. at

8    606, 97 P.3d at 1145. The Nevada Supreme Court stated:

9              As this case illustrates, determining the effectiveness of trial
10       counsel during a direct appeal was impracticable in several ways.
         Normally, post-conviction counsel has the opportunity to peruse this
11       court's decision on direct appeal as a guide and aid in determining what
         issues should be investigated and raised in a post-conviction habeas
12       petition. Nika's SCR 250 counsel did not have this resource. That counsel
         also did not have the length of time to investigate possible avenues of
13       relief that post-conviction counsel usually has. Moreover, with
         simultaneous litigation of both the direct appeal and the SCR 250
14       proceeding, Nika and his trial counsel were placed in an untenable
         position. In regard to the direct appeal, trial counsel should have been
15       unconstrained advocates of Nika's position, willing and able to provide
         advice and support to Nika's direct appeal counsel. However, in the SCR
16       250 proceeding they found themselves defending their own conduct of the
         trial against challenges by Nika. In fact, Nika was required to waive his
17       privilege of attorney-client confidentiality in that proceeding even though
         his direct appeal was not yet decided. We therefore conclude that the
18       SCR 250 proceeding in this case was not, under NRS 34.810(1)(b), a
         proceeding in which Nika could have fully and adequately raised grounds
19       of ineffective trial counsel. For the same reasons, we also decline to rely
         on our 1997 order dismissing Nika's appeal following the SCR 250
20       proceeding as the law of the case. [Footnote: *See Pellegrini v. State*, 117
         Nev. 860, 885, 34 P.3d 519, 535-36 (2001) (recognizing this court's
21       discretion to reconsider its law of a case when warranted).]

22   *Id.*, 120 Nev. at 606-07, 97 P.3d at 1145. The Nevada Supreme Court remanded the

23   case to the state district court for further proceedings with respect to Nika's claims of

24   ineffective assistance of counsel. *See id.*, 120 Nev. at 607-11, 97 P.3d at 1145-48.

25   Regarding the remanded claims, the Nevada Supreme Court stated:

26            We reverse the district court's summary dismissal of Nika's habeas
         claims and remand for that court to determine whether Nika's claims,
27       including claims that trial counsel were ineffective, warrant an evidentiary
         hearing. Whether or not a claim is decided after an evidentiary hearing,
28

the district court must provide specific findings of fact and conclusions of law supporting its disposition of the claims.

*Id.*, 120 Nev. at 607, 97 P.3d at 1145.

On the remand, however, the state district court allowed no factual development regarding Nika's claim that his trial counsel was ineffective with respect to their development and presentation of mitigating evidence in the penalty phase of the trial. The state district court simply did not rule on motions filed by Nika seeking funding for investigation and psychiatric and psychological expert assistance. *See* Motion, Petitioner's Exh. 129 (ECF No. 37-4); *see also* Motion for Discovery, Respondents' Exh. 105 (ECF No. 114-6); Declaration of Glynn B. Cartledge, Petitioner's Exh. 160 (ECF No. 73-2, pp. 139-41). Furthermore, the state district court did not hold an evidentiary hearing, and, in a four-page order, summarily denied all Nika's claims of ineffective assistance of counsel. In the district court's order, there was no discussion of Nika's claim that his trial counsel were ineffective with respect to his mitigation case. *See* Order Granting Motion to Dismiss, Respondents' Exh. 150 (ECF No. 120-3). Nika again appealed, and the Nevada Supreme Court affirmed, stating:

> Nika contends that the district court erred by dismissing his claim that trial counsel were ineffective for failing to conduct an adequate investigation of his case, including failing to consider numerous evidentiary matters and his mental health and childhood history, use services from the Yugoslavian consulate, and allow Nika to speak to the jury to demonstrate his difficulty in speaking English. However, Nika failed to adequately explain how the additional investigation he now proposes would have altered the outcome of his trial. Consequently, the district court did not err by summarily dismissing this claim.

*Id.*, 124 Nev. at 1291; 198 P.3d at 852.

In his second state habeas action, Nika asserted this claim again, and it was ruled procedurally barred. On the appeal in that case, the Nevada Supreme Court ruled, as follows, on Nika's attempt to establish cause and prejudice to overcome the procedural bar by showing that his post-conviction counsel was ineffective:

> Nika argues that the district court erred in denying his claim that post-conviction counsel failed to conduct sufficient investigation into his background to support the claim in his prior petition that trial counsel provided ineffective assistance. He contends that counsel failed to speak

with relatives and neighbors, collect school and military records, or have him evaluated by a mental health expert.

We conclude that this claim lacks merit. Nika did not demonstrate that the additional evidence would have altered the outcome of trial and thus formed the basis of a successful trial-counsel claim. At the penalty hearing, the jury found that the murder was committed at random and without apparent motive. This is a compelling aggravating circumstance. Smith stopped to assist Nika on the side of the highway. Thereafter, Nika struck him several times on the back of the head—at least once while Smith was lying face down on the ground. Nika then rolled Smith onto his back, placed the gun against Smith's head, and shot him. We concluded that the murder occurred in a calculated manner. *Nika III*, 124 Nev. at 1295, 198 P.3d at 854. In addition, the jury was aware that Nika was prone to violent outbursts and threats of violence within his own family, and he had sexually assaulted a woman in 1989. Trial counsel had presented testimony from Nika's wife and his sister-in-law that he was loyal to his friends, a child at heart, and liked by the children in the family. The jury found this evidence insufficiently mitigating. The additional mitigation evidence concerning his upbringing, family history, and cognitive impairments is not powerful enough to demonstrate a reasonable probability of a different outcome had trial counsel presented it. For this reason, we conclude that Nika failed to meet the prejudice prong of his post-conviction-counsel claim.

Order of Affirmance, Respondents' Exh. 196, pp. 5-6 (ECF No. 125-4, pp. 6-7).

While this claim was—at least ostensibly—adjudicated by the state courts in Nika's first state habeas action, because the fact-finding process in that case was defective, and Nika did not have a fair opportunity to develop the facts supporting the claim, the Court does not apply the standard prescribed by 28 U.S.C. § 2254(d), but rather considers the claim de novo. *See Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004) (§ 2254(d) does not apply where the fact-finding "process employed by the state court is defective.") "If, for example, a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts." *Id.* at 1001; *see also Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two prong test for analysis of claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the attorney's representation "fell below an

objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. A court considering a claim of ineffective assistance of counsel must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

In the penalty phase of his trial, Nika's counsel presented little evidence of any kind in mitigation; counsel presented no evidence concerning Nika's background before he came to the United States from Serbia some five years before his arrest and no evidence concerning Nika's intellectual capacity.

In the penalty phase of the trial, the prosecution called as a witness the wife of the murder victim, Edward Smith, and she testified about Smith's good character, their family, his military service, and the loss that she and her daughter suffered. *See* Testimony of Tracy Smith, Transcript of Proceedings, July 10, 1995, Respondents' Exh. 46, pp. 13-18 (ECF No. 108-1, pp. 16-21). The State also called Smith's daughter, who testified about her memories of her father and her loss. *See* Testimony of Amber Smith, Transcript of Proceedings, July 10, 1995, Respondents' Exh. 46, pp. 19-21 (ECF No. 108-1, pp. 22-24). The State also called Nika's mother-in-law and his father-in-law, who testified about Nika's violent temper, and about occasions when Nika threatened them and their daughter, Nika's wife, including occasions when he threatened family members with a gun. *See* Testimony of Anna Boka, Transcript of Proceedings, July 10, 1995, Respondents' Exh. 46, pp. 22-38 (ECF No. 108-1, pp. 25-41); Testimony of Peter

Boka, Transcript of Proceedings, July 10, 1995, Respondents' Exh. 46, pp. 81-95 (ECF No. 108-1, pp. 84-98). The State also called Carlos Calzadilla, who testified about an incident in which Nika threatened him with a machete, mistakenly believing that he had burglarized Nika's family members' home. *See* Testimony of Carlos Alexis Calzadilla, Transcript of Proceedings, July 10, 1995, Respondents' Exh. 46, pp. 45-56 (ECF No. 108-1, pp. 48-59). The State also called a woman who testified that Nika sexually assaulted her. *See* Testimony, Transcript of Proceedings, July 10, 1995, Respondents' Exh. 46, pp. 58-80 (ECF No. 108-1, pp. 61-83).

In the defense case in the penalty phase of the trial, Nika's counsel called two witnesses. The first was Nika's wife, Rodika. *See* Testimony of Rodika Nika, Transcript of Proceedings, July 10, 1995, Respondents' Exh. 46, pp. 96-118 (ECF No. 108-1, pp. 99-121). Nika's counsel questioned Rodika about the allegation that Nika committed a sexual assault. *See id.* at 100-03 (ECF No. 108-1, pp. 103-06). Counsel also questioned her about the incident in which Nika threatened Calzadilla with a machete. *See id.* at 103-06 (ECF No. 108-1, pp. 106-09). And, counsel questioned her about an incident in which Nika got into a fight with her father and allegedly threatened him with a gun. *See id.* at 106-09 (ECF No. 108-1, pp. 109-12). In these lines of questioning, Nika's counsel attempted, mostly unsuccessfully, to cast doubt on the allegations about Nika's violent behavior. Beyond that, though, much of Rodika's testimony actually reflected negatively on Nika. *See*, *e.g.*, *Id.* at 97-99 (her parents did not want her to marry Nika, and they generally did not like him), 98 (Nika would hit things, but not her, when he was angry) (ECF No. 108-1, pp. 100-102). Rodika did testify, generally, that Nika was a good person and a good father, and she loved him. *See id.* at 110, 116-17 (ECF No. 108-1, pp. 113, 119-20). On cross-examination, Rodika acknowledged that she was not present and did not know what happened in the incident in which Nika was accused of sexual assault, in the incident involving him threatening a man with a machete, and in his fight with her father. *Id.* at 112-14 (ECF No. 108-1, pp. 115-17). Also, on cross-examination, the prosecutor elicited testimony from Rodika suggesting that Nika

33

committed a battery on a woman who was seven months pregnant. *See id.* at 117-18 (ECF No. 108-1, pp. 120-21).

The other witness called by Nika's counsel in the penalty phase of his trial was Dorina Vukadin, Nika's sister-in-law. *See* Testimony of Dorina Vukadin, Transcript of Proceedings, July 10, 1995, Respondents' Exh. 46, pp. 119-24 (ECF No. 108-1, pp. 122-27). She testified that Nika was helpful to Rodika's parents, taking care of their yard, and that he was good with her children, but she did not let her children watch the violent movies and television programs that Nika liked to watch. *See id.* at 120-24 (ECF No. 108-1, pp. 123-27).

That was the full extent of Nika's counsel's mitigation presentation.

Nearly all the evidence presented by the defense in the penalty phase was aimed at attempting to neutralize the State's evidence that Nika made threats against family members, that he threatened a man with a machete, and that he committed a sexual assault. *See* Defendant's Opening Statement, Transcript of Proceedings, July 10, 1995, Respondents' Exh. 46, pp. 8-12 (ECF No. 108-1, pp. 11-15). The only affirmative mitigation evidence presented by the defense were some very general statements about Nika made by his wife and his sister in law—that his wife thought Nika was a good person and loved him, and that his sister-in-law thought Nika was good with her children. Defense counsel made no attempt to explain to the jury Nika's apparent violent tendencies. Defense counsel presented no evidence regarding Nika's background in Serbia, his mental health, or his intellectual capacity.

Indeed, on Nika's direct appeal, the Nevada Supreme Court, ruling under NRS 177.055(2)(c) that Nika's death sentence was not imposed "under the influence of passion, prejudice or any arbitrary factor," stated:

> NRS 177.055(2)(c) requires this court to review "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor." Nika argues that the jury's rejection of any mitigating factors demonstrates that the sentence was imposed under the influence of passion and prejudice. The prosecution argues that the jury's

failure to find any mitigating factors resulted from the fact that no mitigating evidence was produced at the sentencing hearing. We conclude that the jury's failure to find any mitigating factors does not prove it acted under the influence of passion or prejudice.

The only mitigating evidence produced by Nika came from his family members, and that testimony was very limited. Rodika, Nika's wife, testified that she believed that Nika was generally a good person, but she also admitted that Nika was violent and had threatened to kill her, her mother, and her father on separate occasions. Dorina Vukadin, Rodika's sister, also testified for the defense. She stated that Nika played sports with her children and that her children liked him, but also that he was a stern disciplinarian. She also stated that he sometimes exposed her children to violent movies and television programs. Anna, Nika's mother-in-law, testified for the prosecution, and her testimony was primarily concerned with Nika's death threats against her and members of her family. On cross-examination, the only positive statement she made regarding Nika was that Nika and Rodika's child loved Nika. We conclude, therefore, that the jury could reasonably have found that the mitigating circumstances did not outweigh the aggravating circumstances and that the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor.

*Nika*, 113 Nev. at 1439-40, 951 P.2d at 1057.

About six years before Nika's trial, the American Bar Association published "Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases" ("Guidelines"), and those have been generally accepted as reflecting standards of practice in death penalty cases. *See* Guidelines, Petitioner's Exh. 122 (ECF No. 36-3); *see also Padilla v. Kentucky*, 559 U.S. 356, 366-67 (2010) ("We long have recognized that '[p]revailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable ....'") (quoting *Strickland*, 466 U.S. at 688); *Porter*, 558 U.S. at 39-40 ("It is unquestioned that under the prevailing professional norms at the time of Porter's trial [in 1988], counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'") (quoting *Williams*, 529 U.S. at 396). Under the Guidelines, "[t]he investigation for preparation of the sentencing phase ... should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." Guidelines, Petitioner's Exh. 122, Guideline 11.4.1 (ECF No. 36-3, p. 14). The Guidelines suggest that defense counsel should develop mitigating evidence regarding the client's background, including medical history

(including mental and physical illness or injury, alcohol and drug use, birth trauma, and developmental delays), educational history, special education needs (including cognitive limitations and learning disabilities), military history, employment and training history, family and social history (including physical, sexual or emotional abuse), adult and juvenile record, correctional experience, and religious and cultural influences. *See id.* (ECF No. 36-3, p. 15); *see also id.*, Guidelines 11.8.3, 11.8.6 (ECF No. 36-3, pp. 24-27).

Nika grew up in Vladimirovac, Serbia. He was nineteen years old when he moved to the United States. His entire biological family and all the records related to his childhood remained in Serbia. He had only been in the United States, and had only known his wife and her family, for about five years at the time of his arrest. Yet, Nika's trial counsel obtained no mitigation evidence regarding his background in Serbia.

Nika has presented in this case extensive detailed evidence showing the sort of mitigation evidence that could have—and should have—been developed and presented in the penalty phase of his trial. This is information about Nika that was left unknown to the jury that sentenced him to death.

Nika has presented evidence demonstrating that several of Nika's family members and acquaintances in Serbia would have been willing to testify on his behalf, including his brothers Sveta and Dejan, his sister-in-law Anka, his aunts Bobica and Maria, his uncles Bosko and Gusti, his cousin Strugerel, childhood friends, a teacher, and others. Nika has also shown that his trial counsel could have found, in Serbia, mitigating military records, school records, and photographs. And, Nika has shown that if his trial counsel had retained an appropriate expert, they could have developed mitigating evidence regarding Nika's mental health and intellectual capacity.

Nika, known as "Vinetu" among his friends and in Serbia, is Roma ("Gypsy"). During his childhood in Serbia, the Roma there were marginalized; they were considered to be of low social status, were discriminated against, and were typically poor. *See* Declaration of Elena Damijan, Petitioner's Exh. 78, ¶ 2 (ECF No. 21-1); Declaration of Petar Trifu, Petitioner's Exh. 79, ¶¶ 4, 5 (ECF No. 21-2); Declaration of

Dejan Nika, Petitioner's Exh. 80, ¶¶ 3, 13 (ECF No. 21-3); Declaration of Marin Topale, Petitioner's Exh. 85, ¶ 10 (ECF No. 22-2); Declaration of Rodika Nika, Petitioner's Exh. 142, ¶ 7 (ECF No. 39-5).

The evidence presented by Nika shows that he grew up in terrible poverty. He lived for about the first seven years of his life, with his family, in a small one-room, packed-earth house, with no electricity or running water. Nika's family burned manure to heat their home, and when it rained the roof leaked. Nika's family sometimes was without enough food, and at times Nika had to beg and scavenge for food. Both Nika's parents worked long hours, and the children, including Nika, began working from a young age. The family's poverty limited the education available to Nika and his brothers. *See* Declaration of Petar Trifu, Petitioner's Exh. 79, ¶ 11 (ECF No. 21-2); Declaration of Dejan Nika, Petitioner's Exh. 80, ¶¶ 6, 8 (ECF No. 21-3); Declaration of Izjava Sevke Milosevic, Petitioner's Exh. 81, ¶ 2 (ECF No. 21-4); Declaration of Marija Miklesku, Petitioner's Exh. 83, ¶¶ 5, 6 (ECF No. 21-6); Declaration of Strugerel Miklesku, Petitioner's Exh. 89, ¶ 3 (ECF No. 22-6); Declaration of Sveta Nika, Petitioner's Exh. 90, ¶¶ 4, 5, 7 (ECF No. 23); Declaration of Izjava-Sorin Olar, Petitioner's Exh. 91, ¶¶ 3, 4 (ECF No. 23-2); Declaration of Tammy R. Smith, Petitioner's Exh. 141, ¶¶ 3-7 (ECF No. 39-4); Declaration of Rodika Nika, Petitioner's Exh. 142, ¶¶ 21-24 (ECF No. 39-5).

Nika's evidence shows that his father, Avram, was an alcoholic who cheated on, and physically abused, Nika's mother. The evidence also shows that Nika and his brothers suffered ruthless physical abuse by their father. Nika's father eventually quit drinking, but the beatings continued. *See* Declaration of Petar Trifu, Petitioner's Exh. 79, ¶ 8 (ECF No. 21-2); Declaration of Dejan Nika, Petitioner's Exh. 80, ¶¶ 9, 10 (ECF No. 21-3); Declaration of Makas "Gusti" Konstandin, Petitioner's Exh. 82, ¶¶ 7, 8 (ECF No. 21-5); Declaration of Marija Miklesku, Petitioner's Exh. 83, ¶¶ 3, 4 (ECF No. 21-6); Declaration of Nedelka "Bobica" Konstandinov and George "Bosko" Konstantin, Petitioner's Exh. 86, ¶ 11 (ECF No. 22-3); Declaration of Strugerel Miklesku, Petitioner's

Exh. 89, ¶ 4 (ECF No. 22-6); Declaration of Sveta Nika, Petitioner's Exh. 90, ¶¶ 8-15 (ECF No. 23); Declaration of Rodika Nika, Petitioner's Exh. 142, ¶ 26 (ECF No. 39-5).

Nika's evidence shows that his intellectual capacity was limited from a very early age, and that he was exposed to a number of risk factors for brain damage including low birth weight, malnutrition, exposure to pesticides, exposure to lead, and head trauma. *See* Declaration of Anka Nika, Petitioner's Exh. 77, ¶ 4 (ECF No. 20-6); Declaration of Dejan Nika, Petitioner's Exh. 80, ¶¶ 13, 14 (ECF No. 21-3); Declaration of Sveta Nika, Petitioner's Exh. 90, ¶¶ 5, 7, 20 (ECF No. 23). Nika attended school only through the eighth grade and barely received passing grades. *See* School Records, Petitioner's Exh. 94 (ECF No. 23-5); School Records, Petitioner's Exh. 123 (ECF No. 36-4). If trial counsel had inquired of Nika's wife, Rodika, they would have discovered that she thought Nika to be of extremely low intelligence:

> Avram was always very gullible and easily frustrated. He was unable to see the subtleties in anything. He had very minimal intellectual capabilities. On a scale from one to ten, with ten being the most intelligent, Avram was a two, and that's being generous.... [H]e never was able to fill out paperwork for himself so I had to do all of that for him.

Declaration of Rodika Nika, Petitioner's Exh. 142, ¶ 9 (ECF No. 39-5, p. 3).

Nika has presented a neuropsychological evaluation, by Tatjana Novakovic-Agopian, Ph.D., who concluded:

> Mr. Nika's performance on the current neuropsychological evaluation, administered in his native language (Serbian), indicated that he has significant cognitive difficulties which were particularly prominent in the domains of memory, executive functioning and language-based tasks. His performance was impaired, at the lowest 1st and 2nd percentile of his age group, on tasks requiring him to learn and recall new information, particularly when presented in the verbal modality. He showed evidence of concrete thinking, mental inflexibility, and decreased problem solving and planning, particularly for novel and more complex tasks, and performed in the lowest 2nd to 5th percentile of his age group on tests assessing the above domains.

Neuropsychological Evaluation, Petitioner's Exh. 76, p. 11 (ECF No. 20-5, p. 12).

Dr. Novakovic-Agopian also wrote:

> Executive control functioning is typically defined as functions guiding goal directed behavior, including planning, problem solving (particularly in novel complex situations), self monitoring, mental flexibility,

and being able to consider alternatives. Individuals with executive dysfunction may exhibit difficulties in one or more of these areas. These can be particularly pronounced when confronted with a stressful situation. In such cases these individuals may feel overwhelmed, not be able to comprehend and process the aspects of the situation, and act impulsively.

On the current neuropsychological evaluation, Mr. Nika exhibited several characteristics of executive dysfunction, including concrete thinking, mental inflexibility, and limited planning and problem solving abilities, particularly in novel and more complex situations. Based on available information and the evaluation, these are chronic impairments and would have been present at the time of the offense in August 1994.

*Id.* at 12-13 (ECF No. 20-5, pp. 13-14).

This Court finds that Nika's trial counsel performed ineffectively in not investigating Nika's background to discover mitigating evidence, such as that described above, and the Court finds, further, that had counsel done so, and presented such mitigating evidence to the jury, there is a reasonable probability that the jury would not have sentenced Nika to death. The jury would have heard of Nika's upbringing as a member of a marginalized group, in abject poverty, in a cold and leaky one-room mud-brick house with no indoor plumbing. The jury would have heard that Nika worked as a child to help support his family and had to beg and scavenge for food. The jury would have heard that Nika's father was an alcoholic for much of Nika's childhood, and that he engaged in extramarital affairs. The jury would have heard that Nika was brutally beaten by his father throughout his childhood. The jury would have heard about Nika's cognitive and impulse-control deficits, and his minimal education. The jury would have heard of Nika's military service. The jury would have heard that, in Serbia, Nika had an extended family and circle of friends that cared about him. In short, available mitigating evidence would have humanized Nika before the jury and would have provided some explanation for Nika's behavior. It is reasonably probable that such mitigation evidence could have changed the balance of aggravating and mitigating circumstances, or the ultimate sentencing decision, for at least one juror. *See Porter*, 558 U.S. at 39-44; *Wiggins*, 539 U.S. at 537 ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)

("'[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse'") (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)); *Eddings*, 455 U.S. at 112 (consideration of defendant's life history is "'part of the process of inflicting the penalty of death'"); *Lambright v. Schriro*, 490 F.3d 1103, 1116-28 (9th Cir. 2007). The Court finds that Nika's federal constitutional right to effective assistance of counsel was violated as Nika claims in Ground 1G.

Nika requests discovery and an evidentiary hearing regarding Ground 1G. *See* Motion for Discovery (ECF No. 166), pp. 14-24; Motion for Evidentiary Hearing (ECF No. 168), pp. 5-6. However, as the Court grants Nika relief with respect to Ground 1G without need for further factual development, the Court will deny his requests for discovery and an evidentiary hearing relative to the claim.

*Ground 6 - Vienna Convention*

In Ground 6, Nika claims that his federal constitutional rights, and his rights under an international treaty and international law, were violated because "[t]he State of Nevada and Mr. Nika's trial counsel failed to inform Mr. Nika that he had a right under Article 36 of the Vienna Convention on Consular Relations to notify Serbian consular officials of his arrest and detention." *See* Second Amended Petition (ECF No. 73), pp. 144-50.

Nika is from Vladimirovac, Serbia. At the time of his arrest and conviction, Nika was a citizen of the Federal Republic of Yugoslavia. The United States and Yugoslavia were signatories to an international treaty known as the 1963 Vienna Convention on Consular Relations ("Vienna Convention"). Nika claims that his rights were violated because the State of Nevada did not notify the Yugoslavian consulate of his arrest, and because he received ineffective assistance of counsel as a result of his trial counsel's

failure to notify him of his rights under the Vienna Convention and failure to contact the Yugoslavian consulate.

Nika raised these claims in his first state habeas action, and on his appeal in that action the Nevada Supreme Court ruled as follows:

> Nika argues that the district court erred by dismissing his claim that trial counsel were ineffective for failing to contact the Yugoslavian consulate because had counsel done so, the consulate would have provided "immense help in securing mitigation." [Footnote omitted.] Nika failed to identify what mitigation evidence the consulate could have provided other than to assert that the consulate could have explained that the vulgar name Smith allegedly called Nika would have incited the "reasonable passions of an average, reasonable Romanian, Serbian or Yugoslavian." Nika contends that this evidence would have shown in the guilt phase and penalty hearing that Smith's murder was at most a "heat of passion," impulsive killing. However, we conclude that Nika failed to demonstrate that there was a reasonable probability of a different outcome but for counsel's failure to contact the consulate. The evidence showed that Smith suffered three blunt force trauma wounds and skull fractures on the back of his head, one of which was inflicted while Smith was lying down. Smith also suffered a contact bullet wound to his forehead. These wounds evince a calculated, deliberate act. It is not clear what additional evidence the consulate could have provided or that there was a reasonable probability of a different outcome had evidence of Yugoslavian social mores been obtained. Therefore, we conclude that the district court did not err by summarily dismissing this claim. [Footnote: To the extent Nika argued that officials failed to contact the Yugoslavian consulate in violation of international law, this claim was appropriate for direct appeal, and we conclude that he failed to demonstrate good cause for his failure to raise it previously or prejudice. See NRS 34.810(1)(b). Therefore, the district court did not err by summarily dismissing this claim.]

Nika, 124 Nev. at 1294-95, 198 P.3d at 854-55. Two justices dissented from this ruling:

> ... I believe that trial counsel were ineffective for not seeking assistance from the Yugoslavian consulate to unearth mitigation evidence. The record reveals that Nika is from Romania and spoke only limited English. In my view, educating the jury respecting Nika's cultural background was essential to explaining his character and conduct. The absence of this evidence prejudiced Nika because the jury was left with an incomplete depiction of his character.

Nika, 124 Nev. at 1302, 198 P.3d at 859-60 (Cherry, J., with whom Saitta, J., agreed, concurring in part and dissenting in part).

Nika raised these claims again in his second state habeas action. The Nevada Supreme Court held the ineffective assistance of counsel claim to be procedurally barred in that action. See Order of Affirmance, Respondents' Exh. 196 (ECF No. 125-4).

41

The Nevada Supreme Court ruled, as follows, that Nika did not make a showing of

cause and prejudice to overcome the procedural bar:

> Nika contends that the district court erred in denying his claim that
> post-conviction counsel were ineffective for failing to engage the services
> of the Serbian consulate in litigating his prior post-conviction petition. He
> asserts that the consulate would have paid for a mental health expert,
> investigated his background in Serbia, and aided witnesses in traveling to
> testify. He contends that the consulate's assistance would have aided in
> demonstrating that trial counsel were ineffective for failing to seek the
> consulate's assistance in litigating the suppression hearing, guilt phase of
> trial, and the case in mitigation. We conclude that Nika failed to
> demonstrate prejudice from post-conviction counsels' litigation of this
> claim. As discussed above, the evidence of Nika's psychological
> condition was not so persuasive as to undermine the evidence received at
> the suppression hearing that Nika responded appropriately to questioning
> and did not seem confused or incapable of waiving his right to remain
> silent. As to the guilt phase of trial, evidence of his cognitive disorder was
> not so persuasive that it would undermine the physical evidence
> demonstrating that the murder was calculated and deliberate. Lastly,
> Nika did not demonstrate that any mitigation evidence that the consulate
> could have aided in producing would have had an effect on the outcome of
> the penalty hearing. Therefore, the district court did not err in denying this
> post-conviction-counsel claim. [Footnote: Nika argues that he never
> received a full and fair opportunity to litigate his claims of ineffective
> assistance of trial counsel because the district court denied his petition
> without conducting an evidentiary hearing. As his claims of ineffective
> assistance of post-conviction counsel and trial counsel lack merit, the
> district court did not err in not conducting an evidentiary hearing.]

*Id.* at 20-21 (ECF No. 125-4, pp. 21-22).

Nika's claim in Ground 6 that his rights were violated because the State did not

contact the Yugoslavian consulate or notify him of his rights under the Vienna

Convention was, in Nika's first state habeas action, ruled procedurally barred in state

court and is therefore subject to the procedural default doctrine in this case. Nika has

not made any showing of cause and prejudice, or any other showing, to overcome this

procedural default. This part of Ground 6 will be denied on the ground of procedural

default.

On the other hand, regarding the claim of ineffective assistance of trial counsel in

Ground 6, the Court determines that Nika has made a showing sufficient to overcome

the procedural bar of that claim. In *Martinez*, the Supreme Court ruled that ineffective

assistance of post-conviction counsel may serve as cause, to overcome the procedural default of a claim of ineffective assistance of trial counsel. *Martinez*, 566 U.S. at 8-9. If the petitioner shows that his counsel was inadequate in the initial collateral review proceeding in state court, the petitioner can overcome the procedural default; to do so, the petitioner must establish that the claim of ineffective assistance of trial counsel is substantial and that post-conviction counsel was ineffective. *Martinez*, 566 U.S. at 16-17. In Nika's first state habeas action, his post-conviction counsel asserted the claim that Nika's trial counsel was ineffective for not contacting the consulate. However, while Nika's first post-conviction counsel did contact the Serbian consulate at Nika's request and had perfunctory communications with the consulate, counsel did not request any assistance from the consulate, and did not take any action to develop evidence to show what assistance the consulate could have provided to Nika's trial counsel. *See* Letter from Nika to Counsel, August 14, 2001, Petitioner's Exh. 163 (ECF No. 73-2, p. 150); Letter from Counsel to Serbian Embassy, August 21, 2001, Petitioner's Exh. 164 (ECF No. 73-2, pp. 152-53); Declaration of Dejan Radulovic, Acting Consul General of the Republic of Serbia in Chicago, Petitioner's Exh. 194 (ECF No. 132-18). The Court finds Nika's post-conviction counsel's performance to be unreasonable in this respect. And, as is discussed below, Nika's ineffective assistance of trial counsel claim in Ground 6 is meritorious; had Nika's post-conviction counsel requested assistance from the consulate, they would have found that the consulate could have provided valuable assistance regarding Nika's case in mitigation. Under *Martinez*, Nika overcomes the procedural default of the ineffective assistance of trial counsel claim in Ground 6, and the Court proceeds to consider the merits of that claim de novo. *See Cone*, 556 U.S. at 472; *Porter*, 558 U.S. at 39.

Respondents argue that Ground 6—apparently including the ineffective assistance of trial counsel claim—is not cognizable in this federal habeas corpus action because "[t]he Supreme Court has never clearly established that the Vienna Convention creates judicially enforceable private rights as opposed to public rights enforceable by

signatory nations to the treaty." Answer (ECF No. 160), pp. 42-43. This argument, in this Court's view, may apply to the claim that the State violated Nika's rights under the treaty, but, as that claim is denied as procedurally defaulted, the Court need not resolve the issue. On the other hand, this argument does not apply to Nika's claim that his right to effective assistance of trial counsel was violated. Nika's claim is that his trial counsel should have known of the Vienna Convention and should have contacted the Yugoslavian consulate on his behalf; such a claim does not turn on the existence of private rights enforceable under the Vienna Convention. The Supreme Court cases cited by Respondents—*Medellin v. Texas*, 552 U.S. 491 (2008), and *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006)—do not involve claims of ineffective assistance of counsel related to the Vienna Convention, and do not preclude Nika's ineffective assistance of counsel claim. *See Sanchez-Llamas*, 548 U.S. at 363-64 & n. 3 (Ginsburg, J., concurring) (noting that the defendant "did not include a Vienna-Convention-based, ineffective-assistance-of-counsel claim along with his direct Vienna Convention claim in his initial habeas petition"); *Osiagiede v. United States*, 543 F.3d 399, 406-08 (7th Cir. 2008).

The Court finds that Nika's trial counsel's performance, in not advising Nika of his rights under the Vienna Convention and in not contacting the Yugoslavian consulate, was objectively unreasonable.

In 1994 and 1995, when Nika was arrested and tried, the United States had been a signatory to the Vienna Convention for some 25 years. At that time, Yugoslavian consular services were available in the United States, at the Yugoslavian embassy in Washington D.C. (For this reason, the Court uses the terms "consulate" and "embassy" interchangeably in referring to the location where Yugoslavian consular services were available in 1994 and 1995.). According to Desko Nikitovic, who was Serbia's Consul General in 2010:

> Within the period when Mr. Nika was tried for allegedly committing acts (1994-95), the Republic of Serbia and the Federal Republic of Yugoslavia, of which Serbia was a part, had an Embassy in Washington

44

which could deal with consular protection of its citizens. Because of the known circumstances in the relations between the two countries, the Embassy was represented at the level of the Charge d'Affere, but the consular operations operated smoothly.

Letter from Desko Nikitovic, Consul General of the Republic of Serbia, to Counsel,

February 3, 2010, Petitioner's Exh. 124 (ECF No. 36-5, p. 2); *see also* Declaration of

Dejan Radulovic, Acting Consul General of the Republic of Serbia in Chicago,

Petitioner's Exh. 161 (ECF No. 73-2, pp. 143-44); Declaration of Milutin Novovic,

Petitioner's Exh. 162 (ECF No. 73-2, pp. 146-48).

When Nika's trial counsel took his case over from the Washoe County Public

Defender's Office, there was a memorandum in the file, stating:

In talking to Mansure [an interpreter], he tells me that all Yugoslav Embassys are closed in this country except perhaps one in Los Angeles and for certain one in Washington, D.C. I need to have some contact through the diplomatic services to the Yugoslav Embassy where ever to determine if we can find a court fluent interpreter. This is vital as using Mansure will require one sentence at a time proceeding.

Request for Investigation, Petitioner's Exh. 95 (ECF No. 23-6). The evidence indicates,

however, that Nika's trial counsel never contacted the Yugoslavian consulate about

finding an interpreter, or for any other purpose.

In 2010, in a letter to Nika's counsel, Desko Nikitovic, the Consul General of the

Republic of Serbia, wrote the following about what the consulate could have done to

assist with Nika's defense:

[I]n the event that the attorneys for Mr. Nika addressed the Embassy, they would have been able to obtain assistance in the sense that they would have been able to contact the parents and relatives of Mr. [Nika] as well as the competent authorities of the Republic of Serbia and inform them about this case. Also, the Embassy could have requested additional information in possession of those authorities, and submit the data to Mr. [Nika's] attorneys.

Letter from Desko Nikitovic, Consul General of the Republic of Serbia, to Counsel,

February 3, 2010, Petitioner's Exh. 124 (ECF No. 36-5, p. 2). In a declaration executed

in 2015 the then acting Consul General of the Republic of Serbia, Dejan Radulovic,

stated:

45

The Ministry [of Foreign Affairs] is not aware of any other instance, anywhere in the world, in which a [Federal Republic of Yugoslavia ("FRY")] or Serbian national has been subjected to a capital sentence. But in other cases involving potentially long terms of incarceration, the country has provided significant funding for the accused's legal team, monitored ... the legal team's effectiveness, assisted in arranging psychosocial and medical evaluations and treatment, as well as interpretation and translation services, and supported the gathering of evidence from family and authorities in Serbia. The Ministry would have worked with the Embassy in Washington to provide these services to Mr. Nika if we had been notified of his arrest in 1994.

Declaration of Dejan Radulovic, Acting Consul General of the Republic of Serbia in Chicago, Petitioner's Exh. 161, p. 2 (ECF No. 73-2, p. 144). Milutin Novovic, who served as a consular officer at the Yugoslavian embassy, in Washington D.C., from 1991 to 1996, states in a declaration:

If I had been informed that Mr. Nika suffers from a neuropsychological condition, or if consular staff observed or otherwise learned of such a condition, the Embassy would have taken steps to have Mr. Nika evaluated by a culturally competent specialist.

\*   \*   \*

Had his counsel requested assistance in securing documentary or physical evidence in the FRY, the Embassy would have provided that assistance. Further, it would have facilitated communication with Mr. Nika's family in the FRY.

Declaration of Milutin Novovic, Petitioner's Exh. 162, p. 2 (ECF No. 73-2, pp. 147).

After Nika's current counsel contacted the Serbian consulate and requested assistance, Serbian officials: facilitated interviews with family and friends of Nika in Serbia; obtained Nika's school, medical and military records; helped secure a neuropsychological evaluation by a culturally competent expert; met with Nika on numerous occasions; filed amicus pleadings in state and federal court; attended court hearings; provided translation and interpretation assistance; put Nika's counsel in touch with a former consular affairs officer; and provided additional information regarding Roma culture. *See* Amicus Brief of the Republic of Serbia (ECF No. 72), p. 6. "Serbia has worked closely with Mr. Nika's counsel to collect a substantial amount of evidence relevant to understanding Mr. Nika's life history and behavior before, during, and after his arrest." *Id.* at 7. With the assistance of the Serbian consulate, Nika's counsel has

developed significant mitigation evidence concerning Nika's childhood and background in Serbia and his neuropsychological condition. *See* Discussion of Ground 1G, *supra*; *see also* Neuropsychological Evaluation, Petitioner's Exh. 76 (ECF No. 20-5); Declaration of Anka Nika, Petitioner's Exh. 77 (ECF No. 20-6); Declaration of Elena Damijan, Petitioner's Exh. 78 (ECF No. 21-1); Declaration of Petar Trifu, Petitioner's Exh. 79 (ECF No. 21-2); Declaration of Dejan Nika, Petitioner's Exh. 80 (ECF No. 21-3); Declaration of Izjava Sevke Milosevic, Petitioner's Exh. 81 (ECF No. 21-4); Declaration of Makas "Gusti" Konstandin, Petitioner's Exh. 82 (ECF No. 21-5); Declaration of Marija Miklesku, Petitioner's Exh. 83 (ECF No. 21-6); Declaration of Izjava Mile Popovica, Petitioner's Exh. 84 (ECF No. 22); (Declaration of Marin Topale, Petitioner's Exh. 85 (ECF No. 22-2); Declaration of Nedelka "Bobica" Konstandinov and George "Bosko" Konstantin, Petitioner's Exh. 86 (ECF No. 22-3); Statement from Jelena Sekesan and Pauna Sekesan, Petitioner's Exh. 87 (ECF No. 22-4); Declaration of Strugerel Miklesku, Petitioner's Exh. 89 (ECF No. 22-6); Declaration of Sveta Nika, Petitioner's Exh. 90 (ECF No. 23); Declaration of Izjava-Sorin Olar, Petitioner's Exh. 91 (ECF No. 23-2); Declaration of Adam Steflja and Darinka Steflja, Petitioner's Exh. 92 (ECF No. 23-3); Military Booklet, Petitioner's Exh. 93 (ECF No. 23-4); School Records, Petitioner's Exh. 94 (ECF No. 23-5); School Records, Petitioner's Exh. 123 (ECF No. 36-4); Letter from Desko Nikitovic, Consul General of the Republic of Serbia, to Counsel, February 3, 2010, Petitioner's Exh. 124 (ECF No. 36-5, p. 2); Declaration of Tammy R. Smith, Petitioner's Exh. 141 (ECF No. 39-4).

The Court finds that Nika's trial counsel unreasonably failed, before trial, to advise Nika of his rights under the Vienna Convention and to contact the Yugoslavian consulate, and that, if Nika's trial counsel had contacted the Yugoslavian consulate before trial, and had, with the assistance of the consulate, developed evidence for presentation in mitigation in the penalty phase of Nika's trial, there is a reasonable probability that the outcome of the penalty phase of Nika's trial would have been different, that is, that the jury would not have imposed the death sentence. Therefore,

with respect to the penalty phase of his trial, the Court finds that Nika's federal constitutional rights were violated because he received ineffective assistance of trial counsel, as a result of his trial counsel's failure to inform him of his rights under the Vienna Convention and contact the Yugoslavian consulate on his behalf.

Regarding the guilt phase of his trial, on the other hand, the Court finds, in view of the strong evidence against Nika, that Nika has not shown a reasonable probability of a different result had trial counsel informed him of his rights under the Vienna Convention or contacted the Yugoslavian consulate on his behalf. The Court denies Nika relief on Ground 6 with respect to the guilt phase of his trial.

Nika requests an evidentiary hearing with regard to the ineffective assistance of counsel claims in Ground 6. *See* Motion for Evidentiary Hearing (ECF No. 168), pp. 5-6. The Court grants relief on this claim with regard to the penalty phase of Nika's trial, without need for further factual development. And, regarding the ineffective assistance of counsel claim in Ground 6 relative to the guilt phase of Nika's trial, the Court finds the request for an evidentiary hearing to be insubstantial. Nika's request does not identify any particular question of fact to be resolved, and he gives no indication what sort of evidence he would offer. Nika's motion for an evidentiary hearing regarding Ground 6 will be denied.

*The Constitutional Errors Relative to the Penalty Phase of Nika's Trial Were Not Harmless.*

In order to obtain habeas corpus relief, the petitioner must show that constitutional errors caused "actual prejudice" or had "substantial and injurious effect or influence" in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted). "While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896–97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302–03 (1973)). Nika meets this standard.

The errors identified by Nika in Grounds 1G and 6—ineffective assistance of counsel on account of trial counsel's failure to develop mitigating evidence concerning Nika's background and mental deficiencies, and on account of trial counsel's failure to inform him of his rights under the Vienna Convention and contact the Yugoslavian consulate on his behalf—go hand in hand. The result of both was the meager case in mitigation presented by the defense in the penalty phase of Nika's trial. As the Nevada Supreme Court recognized on Nika's direct appeal, only very limited mitigating evidence was presented on Nika's behalf. *See Nika*, 113 Nev. at 1439-40, 951 P.2d at 1057. There was essentially no mitigating evidence presented concerning Nika's background in Serbia and his neuropsychological condition. Nika has demonstrated that there was significant such mitigating evidence available, and that the available evidence was strong enough to have made a difference had Nika's counsel discovered it and presented it.

The jury found one aggravating circumstance: that the murder was committed at random and without apparent motive. *See* Verdict, Respondents' Exh. 50 (ECF No. 108-5). This Court finds that the weight of that aggravating circumstance was not great. Contrary the language of the aggravating circumstance, the murder in this case was not "random" and "without apparent motive" as those terms would normally be understood. Rather, it is undisputed that after the victim was killed, Nika took his car. However, the trial court instructed the jury that, under Nevada law, "[a] murder may be random and without apparent motive if the killing of a person was not necessary to complete a robbery." Penalty Phase Jury Instructions, Respondents' Exh. 48, Instruction No. 14 (ECF No. 108-3, p. 15). So, while any murder is an egregious crime, the one aggravating circumstance found in this case was not one that made this murder far more egregious than other first-degree murders committed in conjunction with a theft.

Cognizant of the nature and weight of the one aggravating circumstance found by the jury, the Court finds that the failure of Nika's counsel to develop mitigating evidence concerning his background and mental deficits, and their failure and to inform

49

Nika of his rights under the Vienna Convention and to contact the Yugoslavian consulate on his behalf, had a substantial and injurious effect in determining the jury's verdict imposing the death penalty. And, moreover, the effect of these errors on the part of Nika's counsel was exacerbated by the *Mills* error identified in Ground 7B. Because so little mitigating evidence was presented by counsel, and because the *Mills* error likely prevented the jury from weighing even that mitigating evidence against the aggravating circumstance unless the jurors unanimously agreed upon the existence of a mitigating circumstance, there ended up being little chance that any mitigating evidence at all was weighed against the aggravating circumstance.

In sum, the Court determines that the constitutional errors identified in Grounds 1G, 6 (the ineffective assistance of trial counsel with respect to the penalty phase of the trial) and 7B infected the penalty phase of Nika's trial with unfairness. The Court will, therefore, grant Nika habeas corpus relief, with respect to his death sentence, on Grounds 1G, 6 and 7B.

<u>Nika's Other Claims</u>

The Court denies Nika habeas corpus relief with respect to his other claims, as is discussed below.

*Ground 3 - The Aggravating Circumstance*

In Ground 3, Nika claims that his federal constitutional rights were violated "due to the jury's finding the statutory aggravating circumstance that the murder was committed at random and without apparent motive, which is facially unconstitutional and invalid as applied to Mr. Nika." *See* Second Amended Petition (ECF No. 73), pp. 111-19.

In the penalty phase of Nika's trial, the jury was instructed that first-degree murder could be aggravated, rendering Nika eligible for the death penalty, if the jury found that "[t]he murder was committed upon Edward V. Smith at random and without apparent motive." Penalty Phase Jury Instructions, Respondents' Exh. 48, Instruction No. 12 (ECF No. 108-3, p. 13). The jury was further instructed:

> A murder may be random and without apparent motive if the killing of a person was not necessary to complete a robbery.

*Id.*, Instruction No. 14 (ECF No. 108-3, p. 15). The jury returned a verdict finding this aggravating circumstance and imposing the death penalty. *See* Verdict, Respondents' Exh. 50 (ECF No. 108-5). The jury did not find the murder to be aggravated as committed in the course of a robbery or attempted robbery. *See id.*

Nika asserted this claim on his direct appeal, and the Nevada Supreme Court denied the claim, stating in a divided opinion that Nika "fails to raise an issue not previously addressed by this court in its numerous other opinions upholding the constitutionality of NRS 200.033(9)," and declining to revisit the issue. *See* Opinion, Respondents' Exh. 81, p. 15 (ECF No. 111-5, p. 16) (citing *Lane v. State*, 110 Nev. 1156, 881 P.2d 1358 (1994); *Paine v. State,* 110 Nev. 609, 877 P.2d 1025 (1994), *cert. denied*, 514 U.S. 1038 (1995); *Bennett v. State*, 106 Nev. 135, 787 P.2d 797 (1990); *Moran v. State*, 103 Nev. 138, 734 P.2d 712 91987); and *Ford v. State*, 102 Nev. 126, 717 P.2d 27 (1986)). The Nevada Supreme Court ruled, further, that the evidence supported application of the aggravator because the jury could have found that the killing was not necessary to complete a robbery. *See id.* at 16-18 (ECF No. 111-5, pp. 17-19) (citing *Lane*, *supra*; *Paine*, *supra*; *Bennett*, *supra*; and *Moran*, *supra*). One justice concurred, stating his opinion that the aggravator could have properly applied whether or not the jury found that a robbery occurred. *See id.*, Maupin, J., concurring (ECF No. 111-5, pp. 24-25). One justice dissented, stating his opinion that the evidence did not support a finding that the murder was random and without motive, because there was evidence that Nika killed Smith out of anger or to commit a robbery. *See id.*, Springer, J., dissenting (ECF No. 111-5, pp. 26-31). Another justice dissented, stating his opinion that NRS 200.033(9) should not be applied in the context of a robbery where a jury finds the killing unnecessary for the robbery, that the jury instructions should define the terms "random," "apparent," and "motive" consistent with their usual meanings, and that it was improper for the State to argue during the guilt phase of the trial that Nika acted with a

motive—anger or robbery—and then argue during the penalty phase that he acted without a motive. *See id.*, Rose, J., dissenting (ECF No. 111-5, pp. 36-41).

Nika also asserted this claim in his first state habeas action. In that action, the Nevada Supreme Court again denied relief on the claim, distinguishing Nika's case from the case of *Leslie v Warden*, 118 Nev. 773, 59 P.3d 440 (2002), in which—after Nika's direct appeal but before the appeal in his first state habeas action—the Nevada Supreme Court disavowed the jury instruction applying the aggravator where a killing was unnecessary to complete a robbery, and ruled that the "aggravator only applies to situations in which the defendant selected his victim without a specific purpose or objective and his reasons for the killing are not obvious or easily understood." *Leslie*, 118 Nev. at 782, 59 P.3d at 446. The Nevada Supreme Court stated that the concerns expressed in *Leslie* are not present in Nika's case, because Nika was not charged with robbery and the jury rejected the robbery aggravator, and because the evidence in Nika's case supported the finding that Nika murdered Smith at random and without apparent motive, unrelated to the taking of Smith's property. The court concluded:

> Although *Leslie* altered the scope of the challenged aggravator, Nika fails to persuade us that the doctrine of the law of the case should be abandoned under the particular facts of his case. Consequently, we conclude that the district court did not err by summarily dismissing this claim.

*Nika*, 124 Nev. at 1298-1300, 198 P.3d at 857-58.

An aggravating circumstance must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). To do so, the aggravating circumstance "may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). And, it must not be unconstitutionally vague. *Id.*

The Court determines that the Nevada Supreme Court's denial of this claim was not contrary to, or an unreasonable application of, Supreme Court precedent and was

not based on an unreasonable determination of the facts in light of the evidence. The Court finds that it was not unreasonable for the Nevada Supreme Court to conclude that the aggravator was not unconstitutionally vague, and that it narrowed, at least somewhat, the range of murders to which the death penalty applied. The terms "random" and "apparently without motive" do not necessarily need definition to be understandable. And, as the Nevada Supreme Court ruled on the appeal in Nika's first state habeas action, in view of the evidence at trial, the jury could have found that the murder was unnecessary for the commission of a robbery, and was "random and apparently without motive" as defined for the jury under Nevada law.

With respect to Nika's other arguments—that the application of the aggravator violated his constitutional right of equal protection under the law, that the aggravator subjects less culpable murders to the death penalty, and that the aggravator results in an unconstitutional shift of the burden of proof—Nika does not show the Nevada Supreme Court's rejection of any of those theories to have been contrary to, or an unreasonable application of, Supreme Court precedent.

The Court will deny Nika relief with respect to Ground 3.

*Grounds 1C and 5 - Nika's Statements to the Police*

In Ground 5, Nika claims that his federal constitutional rights were violated "due to the improper admission of Mr. Nika's custodial incriminating statements in violation of *Miranda v. Arizona.*" *See* Second Amended Petition (ECF No. 73), pp. 128-43. In Ground 1C, Nika claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because "[t]rial counsel were ineffective in litigating the motion to suppress Mr. Nika's statements to police." *See id.* at 53-62.

Nika made incriminating statements on three occasions. On August 29, 1994, upon his arrest in Chicago, Nika made statements to Chicago police detectives, in which he repeatedly changed his story about how he came to possess the victim's car. The next day, August 30, 1994, Nevada police officers arrived in Chicago and questioned Nika, and he again made inconsistent statements and an admission. Then,

two days later, on September 2, 1994, when he was being booked into the Washoe County Detention Center, after he was returned to Nevada, Nika made an admission in a response to a question asked by the jail booking officer. Evidence of the first and third of these statements was admitted into evidence in the guilt phase of Nika's trial. *See* Second Amended Petition (ECF No. 73), pp. 128-29, 136. The trial court suppressed evidence of the second of Nika's statements, the statement made to the Nevada police officers in Chicago. *See id.* at 136.

A person subjected to custodial interrogation must be advised that "he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "To admit an inculpatory statement made by a defendant during custodial interrogation, the defendant's waiver of *Miranda* rights must be voluntary, knowing, and intelligent." *United States v. Shi*, 525 F.3d 709, 727 (9th Cir. 2008) (internal quotation marks and citation omitted). In determining the knowing and intelligent nature of the waiver, courts are to consider the totality of the circumstances. *See United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007); *United States v. Gamez*, 301 F.3d 1138, 1144 (9th Cir. 2002). "[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). With respect to the voluntariness of the waiver, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.*

On Nika's direct appeal, the Nevada Supreme Court ruled, sua sponte, as follows, with respect to the statements Nika made to the officer at the Washoe County jail:

> On September 1, 1994, after being extradited to Nevada from Illinois, Nika was booked into the Washoe County jail. The following day, Washoe County Deputy Colleen Villa called Nika aside. Villa worked in the county jail's classification unit and it was her job to place prisoners in an environment where they did not present a danger to themselves or others.

To facilitate the placement process, Villa asked every prisoner a series of questions from a pre-printed questionnaire. One of the questions on the form was, "Have you ever assaulted or battered anyone?" When Villa asked Nika this question, he answered that he had fought with a man one evening around 9 p.m. or 9:30 p.m. and that the man was dead. Nika also stated that a gun was placed to a head, but Villa was unsure of who placed the gun to whose head. Nevertheless, Villa did not pursue the answer nor ask for a clarification from Nika. She merely continued down the list of questions on the form.

The dissent contends that because Villa knew Nika was arrested for murder, she would reasonably foresee the questionnaire would elicit an incriminating response from Nika; and therefore, she engaged in a custodial interrogation by merely reading the questionnaire. Taken a step further, if Villa knew nothing about Nika, the exact same question would not be a custodial interrogation under this analysis. We find this factual distinction unpersuasive. Villa asked the same questions of every prisoner. Villa testified she never asked for clarification from a prisoner nor did she do anything other than move on to the next question. Interestingly, when Nika's counsel was questioned as to why this issue was not raised on appeal, he stated Nika conceded it was merely routine questioning for the purpose of classification and not a custodial interrogation.

Moreover, the safety of prisoners in custody is the purpose behind these questions. There is no getting around this type of question when trying to determine the threat, if any, a particular prisoner may pose to another. While the State can control many things, it cannot control what a prisoner might say when asked a particular question. Therefore, the district court did not err in determining that no custodial interrogation occurred.

*Nika*, 113 Nev. at 1438-39, 951 P.2d at 1056-57. A dissenting justice wrote that, in his opinion, the questioning of Nika at the Washoe County jail was an interrogation, subject to the *Miranda* rule, and it was a violation of Nika's constitutional rights to not exclude Nika's response from evidence. *Id.*, 113 Nev. at 1445-48, 951 P.2d at 1061-63 (Rose, J., dissenting).

Nika then raised this claim in his first state habeas action. *See* Second Supplemental Petition for Writ of Habeas Corpus, Respondents' Exh. 146, pp. 21-36 (ECF No. 119-1, pp. 22-37). The state district court denied the claim (see Order Granting Motion to Dismiss, Respondents' Exh. 150 (ECF No. 120-3)), and the Nevada Supreme Court affirmed without discussion. *Nika*, 124 Nev. at 1291-92, 198 P.3d at 852-53.

The Nevada Supreme Court's ruling that the questioning by the jail booking officer was not an interrogation was not contrary to, or an unreasonable application of,

United States Supreme Court precedent, and was not based on an unreasonable

determination of the facts in light of the evidence. *See Pennsylvania v. Muniz*, 496 U.S.

582, 600-01 (1990); *Rhode Island v. Innis*, 446 U.S. 291, 298-302 (1980). It was not

unreasonable for the Nevada Supreme Court to conclude that the booking officer's

questioning was not such that she should have known it to be reasonably likely to elicit

an incriminating response from Nika. *See Muniz*, 496 U.S. at 600-01; *Innis*, 446 U.S. at

298-302; *see also* Transcript of Proceedings, June 7, 1995, Respondents' Exh. 23, pp.

147-57 (ECF No. 98-1, pp. 148-58).

Regarding his statements to the Chicago police, Nika claims that his waiver of his

*Miranda* rights with respect to those statements was not voluntary, knowing and

intelligent, because of his limited English proficiency, limited education, limited contact

with the American criminal justice system, and limited cultural awareness. It was not

unreasonable for the Nevada Supreme Court to deny relief on this claim. Taking into

account the evidence presented in the trial court (*see* Transcript of Proceedings,

June 7, 1995, Respondents' Exh. 23, pp. 8-207 (ECF No. 98-1, pp. 9-208); Transcript of

Proceedings, June 8, 1995, Respondents' Exh. 24, pp. 3-127 (ECF No. 99-1, pp. 4-

128)), and all the circumstances, the Nevada Supreme Court could reasonably have

ruled that Nika voluntarily, knowingly and intelligently waived his *Miranda* rights.

Nika claims, in Ground 1C, that his trial counsel were ineffective for failing to

argue, in support of the motion to suppress his statements, that Nika could not have

voluntarily, intelligently and knowingly waived his *Miranda* rights because of his

upbringing in Yugoslavia, his cultural background and his cognitive deficits. *See* Second

Amended Petition (ECF No. 73), pp. 53-62. Nika also claims that his trial counsel were

ineffective, with respect to the motion to suppress, because they did not effectively

support his contention that that he had poor command of the English language,

primarily because they retained an unqualified expert. *See id.*

Nika raised this claim of ineffective assistance of his trial counsel for the first time

in state court in his second state habeas action, and it was ruled procedurally barred in

that action. *See* Order entered March 16, 2017 (ECF No. 151), pp. 7-8. On the appeal in that action, the Nevada Supreme Court ruled, as follows, that Nika did not make a showing of cause and prejudice, under state law, to overcome the procedural bar:

> Nika contends that trial counsel were ineffective for failing to present the following witnesses to testify during his suppression hearing: (1) an expert witness to testify about cultural differences and his cognitive deficits, (2) lay witnesses to corroborate his poor English skills, (3) an expert familiar with the Yugoslavian legal system to testify that Nika would concede guilt because he feared torture and that Nika should have expected the automatic appointment of counsel in the case of a serious offense, and (4) a Roma cultural expert to demonstrate that Nika perceived that police officers would treat him unfairly as he was Roma. He asserts the district court erred in concluding that post-conviction counsel was not ineffective for failing to litigate this claim of ineffective assistance of trial counsel in an effective manner.

> We conclude that Nika failed to demonstrate that he was prejudiced by post-conviction counsels' omission of this trial-counsel claim. Nika's proposed new evidence is unpersuasive because it is largely internally inconsistent as some of that evidence showed that Nika had cognitive difficulties and confessed because he feared torture by the authorities, while other evidence portrayed him as sophisticated enough with the Serbian justice system to expect appointed counsel during his interrogation. The evidence is also inconsistent with the trial record—his proffered fear of torture was undermined by the fact that he made requests for food and cigarettes during the brief interrogation. Therefore, this evidence does not undermine the testimony presented in the trial court that Nika had communicated in English with jail staff, detectives, and another inmate or show that his waiver was not knowing or voluntary. *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (admitting evidence where the prosecution demonstrates that an accused knowingly and voluntarily waived his right to remain silent). Moreover, there was sufficient evidence apart from the statement to sustain his conviction, including witnesses who placed him in the area of the murder with the victim, the victim's blood on Nika's clothing, the victim's belongings in Nika's possession, and Nika's self-incriminating statements to another inmate. Given these circumstances, we are not convinced that post-conviction counsels' omission of this trial-counsel claim was objectively unreasonable or resulted in prejudice. Therefore, Nika failed to demonstrate that the district court erred in denying this claim.

Order of Affirmance, Respondents' Exh. 196, pp. 7-8 (ECF No. 125-4, pp. 8-9).

This Court agrees with the Nevada Supreme Court's conclusion in this regard. Nika has not shown cause and prejudice, under *Martinez*, with respect to this claim. Nika's counsel in his first state habeas action was not ineffective for not asserting that trial counsel were ineffective with respect to their litigation of the motion to suppress, and Nika was not prejudiced.

Therefore, the Court will deny Nika relief with respect to Grounds 1C and 5.

Nika requests leave of court to conduct discovery regarding Grounds 1C and 5, and he requests an evidentiary hearing regarding Ground 1C. *See* Motion for Discovery (ECF No. 166), pp. 24-29, 47-48; Motion for Evidentiary Hearing (ECF No. 168), p. 12. Regarding Ground 5, as the Court resolves the claim under 28 U.S.C. § 2254(d), the Court will deny Nika's request for factual development regarding the claim. Regarding Ground 1C, Nika proposes discovery with respect to his English proficiency and cultural factors that allegedly affected his waivers, subjects unrelated to the grounds on which the claim is denied. The suggested discovery would have no effect on the Court's resolution of this claim. The Court finds that Nika has not shown good cause for discovery, and the Court will deny this request for discovery on this claim. As for Nika's request for an evidentiary hearing on Ground 1C, the Court finds that request to be insubstantial. Nika mentions Ground 1C only in passing in his motion for evidentiary hearing and does not provide any argument as to what factual issue should be addressed or what sort of evidence he would seek to present. The Court will deny Nika's motions for discovery and an evidentiary hearing with respect to these claims.

*Grounds 1F2, 4A and 8 - Nika's Statements to Nathanial Wilson*

In Ground 4A, Nika claims that his federal constitutional rights were violated because Nathanial Wilson, acting as an agent of the State, elicited statements from Nika in the Washoe County Jail, without Nika's counsel present, after Nika's right to counsel had attached, and because "[t]he State committed misconduct by failing to disclose an executory promise of benefits made to witness Nathanial Wilson." *See* Second Amended Petition (ECF No. 73), pp. 120-26. In Ground 8, Nika claims that his federal constitutional rights were violated "due to the trial court's improper, repeated ex parte contacts with the State regarding an executory promise of benefits to State's witness Nathanial Wilson." *See id.*at 160-61. In Ground 1F2, Nika claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because "[t]rial counsel were ineffective for failing to investigate and present evidence

that Nataniel Wilson was acting as an agent of the State, and received benefits in exchange for his testimony." *See id.* at 77-78.

Nika asserted these claims in state court, and the Nevada Supreme Court ruled on them on their merits.

With respect to Nika's claims in Grounds 4A and 8, the state district court held an evidentiary hearing (*see* Transcript of Proceedings, Respondents' Exhs. 122, 123 (ECF Nos. 116-12, 117-1)), and denied the claims, and, on appeal, the Nevada Supreme Court affirmed, ruling as follows:

> Nika claims that the State's use of Wilson, the jailhouse informant, was unconstitutional. The district court held an evidentiary hearing on this claim and rejected it, providing factual findings and legal conclusions. The State has not disputed that Nika could not have raised this issue on direct appeal, apparently because he did not learn of and had no reason to know of the pretrial meetings regarding Wilson until sometime after his appeal was decided. The question is whether the claim warrants any relief. We conclude that it does not.
>
> \*   \*   \*
>
> Nika's first contention is that the State's use of Wilson violated Nika's Sixth Amendment right to counsel. He cites *Massiah v. United States* [footnote: 377 U.S. 201, 205-07, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *see also Fellers v. United States*, 540 U.S. 519, 124 S.Ct. 1019, 157 L.Ed.2d 1016 (2004) (same)], which holds that the Sixth Amendment right to counsel prevents admission of evidence of a defendant's statements which have been deliberately elicited by a government agent after the right has attached. Nika enjoyed such a right when he spoke to Wilson because adversarial proceedings had begun [footnote: *Estelle v. Smith*, 451 U.S. 454, 469-70, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (stating that the Sixth Amendment right to counsel attaches once adversarial proceedings have been initiated); *see also* U.S. Const. amend VI] and he was represented by the Public Defender. He fails, however, to show that Wilson acted as an agent of the State when he first gained incriminating information from Nika. Determining whether a person acted as a state agent depends on the facts and circumstances of each case and presents a mixed question of fact and law. [Footnote: *Simmons v. State*, 112 Nev. 91, 99, 912 P.2d 217, 221 (1996).]
>
> Nika speculates that the police "approached" Wilson and "baited" him into eliciting information about Nika. This speculation lacks hard evidence. Nika points out that when Wilson was interviewed on October 11, 1994, he first spoke about another inmate until the interviewing detective expressly asked about Nika. This does not indicate that Wilson was a state agent: he had already talked with Nika and had already told a deputy at the jail that he had information from Nika. Nika points out that the detective did not refuse Wilson's offer to gather more information. In the interview, when Wilson remarked that he could find out more about the

gun Nika used, the detective did not respond. This detail is germane to Wilson's status after the interview when he gained further information from Nika; it does not somehow retroactively render him a state agent in his earlier conversations with Nika. Nika also claims that the transcript of the interview is not complete (or that prosecutor Stanton "blatantly lied") because the transcript differs from the description of the interview Stanton gave to the trial court more than two weeks later and because the transcript shows that the detective spoke to Wilson while the tape recorder was off despite stating otherwise. We conclude that these discrepancies are trivial. Nika also stresses that a report by a jail deputy referred to Wilson as "my informant" and speculates that other police reports are missing. But "informant" is not synonymous with "agent," and speculation unsupported by facts is of no value. In the end, Nika presents no proof, most notably no testimony or even affidavit by Wilson, to contradict the evidence that Wilson did not act on behest of the State initially. This evidence includes Wilson's trial testimony, prosecutor Stanton's testimony at the post-conviction hearing and his original representations to the trial court, prosecutor Viloria's post-conviction testimony, and the timing and substance of events in Wilson's own case, discussed below.

Wilson's status after his first interview with the detective and after Stanton ensured that the Public Defender would be discharged and that Wilson would continue to have access to Nika is not so clear. When during the interview Wilson remarked that he could find out more about the gun, he revealed that he thought his role might be to gather more information for officials. Neither the detective nor anyone else dissuaded him from this idea, and his trial testimony indicates that he then actively elicited more information from Nika. Furthermore, when Stanton made sure that Wilson stayed in proximity to Nika, Stanton was aware of Wilson's remark, having observed the interview. Stanton was also aware that the two inmates had formed a relationship in which Nika confided in Wilson. But even assuming these facts establish that after the interview Wilson acted as an agent of the State [footnote: *Cf.*, *e.g.*, *People v. Whitt*, 36 Cal.3d 724, 205 Cal.Rptr. 810, 685 P.2d 1161, 1168-73 (1984) (concluding that though question was close and difficult, inmate informant's conduct was not attributable to the state), *limitation on other grounds recognized by People v. Marquez*, 1 Cal.4th 553, 3 Cal.Rptr.2d 710, 822 P.2d 418 (1992)], Nika was not prejudiced because Wilson obtained the primary incriminating evidence— that Nika admitted in some detail to shooting the victim—before approaching the authorities. The little information that Wilson obtained later, mainly that the murder weapon was an automatic, was insignificant.

Nika also suggests that Stanton made an implicit agreement with Wilson for his testimony without revealing it to the defense or the jury. This would violate due process under *Brady v. Maryland* [footnote: 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] and its progeny because acts which imply an agreement or understanding with a witness are relevant to credibility and must be disclosed. [Footnote: *See Giglio v. United States*, 405 U.S. 150, 155, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Jimenez v. State*, 112 Nev. 610, 622, 918 P.2d 687, 695 (1996).] But again Nika fails to provide facts to support his claim. The most that he demonstrates is that according to Stanton's pretrial representation to the trial court, Wilson at his interview "informed the detectives that he would like some consideration for his testimony, although no specifics were given or requested by him." However, prosecutors Stanton and Viloria both testified at the post-conviction hearing that regardless of any expectations on

Wilson's part, they neither offered nor provided him with any benefits in exchange for his testimony.

Moreover, the timing and substance of events in Wilson's own case in 1994 repel Nika's assertion that Wilson expected and received leniency in return for his assistance in Nika's case. On September 29, Wilson pleaded guilty to unlawful sale of a controlled substance, having reached a plea agreement requiring the State to concur with the recommendation of the Division of Parole and Probation. About a week passed before Wilson approached officers at the jail, on or around October 7, with information about Nika, and the detective interviewed Wilson on October 11. The Division completed its presentence investigation report on Wilson on November 7, recommending a suspended sentence and probation. In Wilson's statement attached to the report, he proclaimed a general willingness to help police, but nothing in the report noted his assistance in Nika's case. Wilson was sentenced on November 16, more than seven months before Nika's trial, and again his assistance in Nika's case was not raised. Thus, Wilson first offered to give information against Nika only after reaching a plea agreement in his own case, and he testified against Nika long after being sentenced himself.

Nika infers from Stanton's presence at Wilson's sentencing that Stanton must have spoken to District Judge Kosach on Wilson's behalf. No other evidence supports this inference, and Stanton denied it. Stanton did not recall attending the sentencing, but there is no need to assume that he was there to benefit Wilson. It is possible that he attended to ensure that the Public Defender withdrew from representing Wilson and/or to see whether Wilson would be in prison or would have to be subpoenaed to testify at Nika's trial. (Wilson's eventual presence was secured from California by a material witness order and bench warrant.) Regardless, Nika fails to provide any proof that Stanton intervened on Wilson's behalf or that Wilson received any benefit from testifying against Nika.

Next, Nika contends that the pretrial meetings between the trial court, Stanton, and at times the Public Defender violated his due process right to disclosure of exculpatory information and his right to conflict-free counsel. In condemning the meetings, Nika relies again on his claims that Wilson was an agent of and had reached an agreement with the State. These contentions are unavailing. As explained above, Wilson initially acted on his own in gaining the primary incriminating evidence from Nika, the Public Defender acted to protect Nika's interests in warning him not to speak to other inmates, and there is no showing that Wilson made an agreement with the State. Nika also claims that Stanton told the defense nothing about Wilson, leaving the defense unable to impeach Wilson's claim that he had no ulterior motive in testifying against Nika. Actually, the State informed the defense before trial about Nika's admissions to Wilson. It appears that the only information not disclosed was Stanton's observation that Wilson told detectives that he would like some consideration for his testimony. Nika emphasizes that Wilson testified he came forward to police because Nika "just didn't have no heart" and that the prosecutor relied on this testimony in the penalty phase. Nevertheless, even assuming that Stanton should have informed the defense of Wilson's statement regarding consideration, we agree with the district court that Nika failed to demonstrate prejudice: even if Wilson approached officers hoping to gain some benefit and the jury had learned this, there was no reasonable probability of a different result in Nika's trial.

61

The district court did not err in denying this claim. *Nika*, 120 Nev. at 607-11, 97 P.3d at 1145-48.

With respect to Nika's claim based on *Massiah*, in Ground 4A, this Court determines that the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, that case, and was not based on an unreasonable determination of the facts in light of the evidence. In light of the evidence, it was reasonable to conclude that, at least before Wilson met with the detective, he was not an agent of the State. And, further, it was reasonable to conclude that after that meeting, any additional information that Wilson learned from Nika had no significant impact at trial.

Similarly, with respect to Nika's claim based on *Brady*, in Ground 4A, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, that case, and was not based on an unreasonable determination of the facts in light of the evidence. Nika's claim is that the State did not disclose to the defense the existence of an agreement with Wilson, under which he would receive consideration in return for gathering evidence against Nika and/or testifying at trial, but, in light of the evidence, it was not unreasonable for the Nevada Supreme Court to conclude that there was no such agreement. Nika makes no showing that any exculpatory evidence was withheld from the defense.

Turning to Nika's claim, in Ground 8, that his constitutional rights were violated as a result of the trial court's *ex parte* communications with the prosecution regarding Wilson, that claim fails because Nika does not point to any United States Supreme Court precedent that is contrary to, or that was misapplied in, the Nevada Supreme Court's ruling.

And, regarding Nika's related claim of ineffective assistance of his trial counsel, in Ground 1F2, Nika does not make a showing how his trial counsel performed unreasonably, and he does not make a showing how his trial counsel could have done anything different that might have brought a different outcome at trial. The Nevada

Supreme Court's ruling, affirming denial of relief on this claim, was not contrary to, or an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts in light of the evidence.

The Court will deny Nika habeas corpus relief on Grounds 1F2, 4A and 8.

Nika requests discovery regarding Grounds 1F2 and 4A. *See* Motion for Discovery (ECF No. 166), pp. 29-42. However, as the Court denies these claims under 28 U.S.C. § 2254(d), further factual development is foreclosed, and there is no good cause for the discovery. Nika's request for discovery here will be denied.

*Ground 1F1 - Defense Theory*

In Ground 1F1, Nika claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because "[t]rial counsel were ineffective for failing to investigate and present an argument that Mr. Nika was provoked and acted in the heat of passion, or in self-defense." *See* Second Amended Petition (ECF No. 73), pp. 73-77.

Nika asserted this claim in his first state habeas action, and the Nevada Supreme Court affirmed the denial of relief on the claim, as follows:

> Nika contends that the district court improperly dismissed his claim that trial counsel provided ineffective assistance by pursuing a defense that someone else murdered Smith rather than the theory that Nika killed Smith in self-defense. We disagree. Nika told the police that he did not kill Smith and actually purchased Smith's car. And he repeatedly told trial counsel that he did not kill Smith. Further, jailhouse informant Wilson testified that Nika admitted to shooting Smith in the head after striking Smith with a crowbar. Moreover, the medical evidence showed that Smith suffered three blunt trauma wounds and skull fractures on the back of his head, one of which was inflicted while Smith was lying face down. And Smith suffered a single contact bullet wound on his forehead that was consistent with the gun being placed directly on his skin when it was fired. This evidence belies a self-defense theory. Based on Nika's statement to the police denying his involvement in Smith's murder and his repeated denials to counsel, challenging the State's evidence against Nika as insufficient to prove that he was the killer was reasonable. We conclude that Nika failed to adequately substantiate his claim that counsel's decision to pursue a defense that someone other than Nika killed Smith was unreasonable or that but for counsel's decision to pursue this defense, there was a reasonable probability of a different outcome. Therefore, we conclude that the district court did not err by summarily dismissing this claim.

1    *Nika*, 124 Nev. at 1292, 198 P.3d at 853.

2            Nika asserted such a claim again in his second state habeas action, and the

3    Nevada Supreme Court ruled that the claim was procedurally barred, and that Nika did

4    not show cause and prejudice to overcome the procedural bar, as follows:

5            Nika argues that the district court erred in denying his claim that
     post-conviction counsel were ineffective for failing to litigate trial counsels'
6    failure to refute the evidence of first-degree murder. He asserts that trial
     counsel were ineffective for failing to develop evidence that Nika may
7    have acted in self-defense or the heat of passion in response to the victim
     attempting to rob him at gunpoint or evidence that might explain why he
8    was not forthcoming with the police.

9            We have previously concluded that the physical evidence in this
     case belies a claim of self-defense and instead shows a calculated effort
10   to kill the victim. *Nika v. State* (*Nika III*), 124 Nev. 1272, 1295, 198 P.3d
     839, 854 (2008). The victim was shot while he was lying helpless on the
11   ground after being felled by three strikes to the back of his head. *Id.* at
     1277, 198 P.3d at 843. As he could not have been a threat at the time
12   he was shot, self-defense is not a viable defense. *See Runion v. State*,
     116 Nev. 1041, 1051, 13 P.3d 52, 59 (2000) (acknowledging that the
13   killing of another in self-defense is justified where the person who does the
     killing "actually and reasonably believes" that he is in imminent danger of
14   death or great bodily injury from the assailant and the use of force that
     might cause death of the assailant is "absolutely necessary under the
15   circumstances ... for the purpose of avoiding death or great bodily injury
     to himself"). Further, as the victim was struck at least once while lying
16   face down and then turned over and shot in the forehead, there was
     undoubtedly time to reflect and deliberate on the course of action.
17   Therefore, Nika did not demonstrate that psychological evidence or
     argument for a lesser degree of homicide would have altered the outcome
18   of trial. For these reasons, a trial-counsel claim based on the failure to
     refute the evidence of first-degree murder with evidence of self-defense or
19   heat of passion would not have had merit. We cannot fault post-conviction
     counsel for omitting it.
20
             Nika also failed to demonstrate that post-conviction counsel
21   were ineffective for failing to introduce the testimony of a Roma cultural
     expert to explain how his distrust of the police prevented him from
22   asserting that he acted in self-defense during his first interview. However,
     expert testimony explaining Nika's propensity to lie to police does not
23   render any account that he gave to police any more credible than any
     other account. Moreover, the physical evidence at the scene belied any
24   claim of self-defense. Therefore, Nika failed to demonstrate that the
     testimony would have affected the outcome of the trial and that
25   postconviction counsel were ineffective for failing to introduce it during his
     prior post-conviction proceedings.
26

27   Order of Affirmance, Respondents' Exh. 196, pp. 11-13 (ECF No. 125-4, pp. 12-14).

28

This Court finds this claim to be without merit. Given the strong evidence undermining a heat-of-passion or self-defense theory, as described by the Nevada Supreme Court, it was not unreasonable for trial counsel to eschew such a defense. The Nevada Supreme Court's ruling, in Nika's first state habeas action, was not contrary to, or an unreasonable application of, Supreme Court precedent and was not based on an unreasonable determination of the facts in light of the evidence.

Nika contends that, in light of the new evidence presented in this case and in his second state habeas action, including evidence regarding his cultural background and his neuropsychological condition, the Court should treat this claim as procedurally defaulted, should find under *Martinez* that his counsel was ineffective in his first state habeas action, or should find that the fact-finding process in Nika's first state habeas action with respect to this claim was defective, and should rule on the claim de novo, without granting the Nevada Supreme Court's ruling deference under 28 U.S.C. § 2254(d). This approach would not change the outcome. Viewing the claim de novo and taking into consideration all the evidence presented in support of the claim in this case, the result would be the same. In this Court's view, trial counsel was not unreasonable, in hindsight, for not asserting a heat-of-passion or self-defense theory that was contrary to representations made by Nika, and Nika was not prejudiced. The strong evidence weighing against a heat-of-passion or self-defense theory does not allow for such second-guessing of trial counsel's strategy.

The Court denies Nika relief with respect to Ground 1F1.

Nika requests discovery and an evidentiary hearing regarding Ground 1F1. *See* Motion for Discovery (ECF No. 166), pp. 29-40; Motion for Evidentiary Hearing (ECF No. 168), pp. 5, 12. However, as the Court denies the claim under 28 U.S.C. § 2254(d), and as it appears the proposed discovery and the evidence that would apparently be proffered at an evidentiary hearing would not affect the Court's reasons for denying the claim even if it were considered de novo, there is no good cause for the discovery, and

there is no showing that an evidentiary hearing is warranted. Those requests will be denied.

*Grounds 1D, 9B and 9C - Juror Voir Dire*

Nika asserts three claims involving juror voir dire at his trial. In Ground 1D, Nika claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because "[t]rial counsel were ineffective for failing to conduct adequate voir dire." *See* Second Amended Petition (ECF No. 73), pp. 62-71. In Grounds 9B and 9C, Nika claims that his federal constitutional rights were violated as a result of prosecutorial misconduct during juror voir dire. *See id.* at 162, 164-68.

Nika's specific claims of error by his trial counsel in juror voir dire, in Ground 1D, are as follows:

- "Trial counsel's questioning of the persons on the venire consisted for the most part of rambling personal stories followed by questions posed to the entire venire that did not invoke any responses." Second Amended Petition (ECF No. 73), p. 63.

- Trial counsel did not ask any questions of jurors Robert Greiner, John Moon, Denise Fitts and Kathryn Main. *Id.*

- Trial counsel failed to ask jurors Patrick Norris, Helen Coughlin, Linda Little, Raymond Freeman, William Schneider, Russell Horning and Kevin Lassen meaningful questions to determine their fairness and impartiality. *Id.* at 64.

- Trial counsel failed to sufficiently voir dire the venire regarding the military conflict in Serbia, to ensure that none were biased against Nika, as a Serb, as a result of media coverage of the conflict. *Id.* at 64-66.

- Trial counsel failed to ask questions of juror Raymond Freeman to discover that he was an Air National Guardsman who served at the same facility as the victim, and to discover his attitudes regarding the death penalty and foreigners. *Id.* at 66-67.

- Trial counsel failed "to strike venire member Mark Porsow for cause, instead electing to remove him by using one of the defense's peremptory challenges." *Id.* at 67-68.

- Trial counsel failed to take any steps to "life qualify" the jury. *Id.* at 68.

- Trial counsel made inflammatory comments that prejudiced the jury against Nika. *Id.* at 68-69.

-    Trial counsel failed to object to the State's use of peremptory challenges to remove persons from the venire on the basis of gender. *Id.* at 69-70.

-    Trial counsel failed to object to questioning by the prosecution that deprived Nika of the presumption of innocence, and that misstated the law. *Id.* at 70.

-    Trial counsel failed to immediately move to strike venire member Dustin Speek when he made xenophobic comments. *Id.* at 70-71.

-    Trial counsel failed to move to remove juror Russell Horning for cause, because he knew that his brother-in-law served in the Air National Guard with the victim, and that his brother-in-law was present in the courtroom during the trial. *Id.* at 71.

Nika raised these claims in state court for the first time in his second state habeas action, and they were ruled procedurally barred; Nika argued that ineffective assistance of his first post-conviction counsel was cause for the procedural bar, such as to excuse it, and the Nevada Supreme Court rejected that argument, as follows:

Nika contends that the district court erred in denying his claim that post-conviction counsel were ineffective for failing to argue that trial counsel were ineffective during voir dire. He asserts that trial counsel were ineffective for (1) failing to question some veniremembers, (2) failing to ask meaningful questions of other veniremembers, (3) failing to inquire about veniremembers' knowledge of the Serbian military conflict, (4) failing to life-qualify the venire, (5) making inflammatory comments during jury selection, (6) failing to object pursuant to *Batson* [footnote: *Batson v. Kentucky*, 476 U.S. 79 (1986)] to the State's use of peremptory challenges to remove veniremembers based on their gender, (7) failing to object to prosecution questions that undermined the presumption of innocence, (8) failing to strike a veniremember earlier in the process to prevent him from contaminating the rest of the venire, and (9) failing to remove biased veniremembers. He also contends that trial counsel failed to adequately address State misconduct during voir dire. He asserts that if post-conviction counsel had raised these claims concerning voir dire as trial-counsel claims, the court would not have denied them as procedurally defaulted.

We conclude that the district court did not err in denying these claims because Nika failed to show prejudice. Claims (1)-(4) are based on trial counsels' failure to make particular inquiries during voir dire. In general, those decisions involve trial strategy and it is not clear that the strategy employed by counsel was not objectively reasonable. *See, e.g.*, *Stanford v. Parker*, 266 F.3d 442, 453-55 (6th Cir. 2001) (observing that defendant has right to life-qualify jury upon request but failure to do so may be reasonable trial strategy); *Brown v. Jones*, 255 F.3d 1273, 1279-80 (11th Cir. 2001) (reasonable trial strategy for counsel to focus jurors' attention on the death penalty as little as possible and therefore not life-qualify jurors); *Camargo v. State*, 55 S.W.3d 255, 260 (Ark. 2001) ("The decision to seat or exclude a particular juror may be a matter of trial strategy or technique."). And, as to all claims but (6), *supra*,

67

Nika failed to demonstrate prejudice because he failed to show that the seated jury was not impartial. [Footnote set forth below.] *See Wesley v. State*, 112 Nev. 503, 511, 916 P.2d 793, 799 (1996) (stating that "[i]f the impaneled jury is impartial, the defendant cannot prove prejudice" resulting from district court's limitation of voir dire); *see also Ham v. State*, 7 S.W.3d 433, 439 (Mo. Ct. App. 1999) ("Even assuming it would have been better strategy to strike [a particular juror], we fail to see how [defendant] could have been prejudiced because one qualified juror sat rather than another."). Because a trial-counsel claim on any of these grounds would not have entitled Nika to relief, he cannot demonstrate prejudice based on post-conviction counsel's failure to raise them as such.

As to the *Batson*-based trial counsel claim, Nika failed to demonstrate that post-conviction counsels' performance was deficient or that he was prejudiced by the failure to argue trial counsels' ineffectiveness. Assuming that trial counsel could have demonstrated a prima facie case of discrimination, *see Libby v. State*, 113 Nev. 251, 255, 934 P.2d 220, 223 (1997) (explaining that State's use of seven of nine of its peremptory challenges to remove women supports an inference of discrimination), Nika bore the burden of ultimately demonstrating that any gender-neutral reason given for the strike was a pretext for discrimination, *Ford v. State*, 122 Nev. 398, 403, 132 P.3d 574, 577 (2006); *see Johnson v. California*, 545 U.S. 162, 171 (2005) (noting the "burden of persuasion 'rests with, and never shifts from, the opponent of the strike'" (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995))). The type of questions asked of the potential jurors did not clearly indicate a discriminatory intent, women were not entirely eliminated from the jury or even underrepresented, and the case did not appear sensitive to bias based on gender. *See Ex Parte Trawick*, 698 So. 2d 162, 168 (Ala. 1997) (considering, among other factors, the manner in which a party questions potential jurors and disparate treatment during voir dire, as evidence of discriminatory intent); *State v. Martinez*, 42 P.3d 851, 855 (N.M. App. 2002) (considering, among other factors, whether cognizable group was underrepresented on the jury or the case was particularly sensitive to bias as evidence of discriminatory intent). Nika's speculation that the State would have been unable to proffer gender-neutral reasons for the strikes or its reasons would be exposed as a pretext for discrimination did not demonstrate that trial counsels' failure to pursue a *Batson* objection was objectively unreasonable based on the information available at the time of trial. *See Rhyne v. State*, 118 Nev. 1, 8, 38 P.3d 163, 167 (2002) (observing that counsel's decision if and when to object is a tactical decision); *Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989) ("[T]actical decisions are virtually unchallengeable.").

[Footnote: Nika only identifies two seated jurors who he contends were biased against him: Russell Horning and Raymond Freeman. As to Horning, the allegation of bias is based on Horning's discovery during trial that his brother-in-law worked at the same base where the victim was stationed. Because Horning indicated that he did not know the victim and that it would not affect his ability to impartially weigh the facts of the case, the record does not support the conclusion that Horning was biased. As to Freeman, the allegation of bias involves his views on penalty as reflected in an affidavit completed roughly fifteen years after the verdict. This information was not available to trial counsel and therefore could not be

the basis for a claim that trial counsel were ineffective. *See* Strickland, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). At the time of trial, Freeman did not indicate that he could not follow the instructions of the court, or that he would impose the death penalty in every case. Based on the information available to trial counsel, there were no grounds to remove Freeman.]

Order of Affirmance, Respondents' Exh. 196, pp. 8-11 (ECF No. 125-4, pp. 9-12).

This Court agrees with the conclusion of the Nevada District Court: Nika's post-conviction counsel was not ineffective for not asserting this ineffective assistance of trial counsel claim, and Nika was not prejudiced. Much of what Nika complains of, regarding his trial counsel's performance at jury selection, was plainly a matter of strategy. More importantly though, Nika does not show that he was prejudiced by the alleged shortcomings of his trial counsel with respect to jury selection.

"Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased." *Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004) (citing *United States v. Quintero–Barraza*, 78 F.3d 1344, 1349 (9th Cir. 1995)). "The Supreme Court has suggested that the relevant test for determining whether a juror is biased is 'whether the juror[ ] ... had such fixed opinions that [he] could not judge impartially the guilt of the defendant.'" *Quintero–Barraza*, 78 F.3d at 1349 (quoting *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)) (alterations in original). Nika does not show that any juror was biased. Juror Raymond Freeman's 2010 declaration does not, in this Court's view, support the contention that he was biased—that he had such fixed opinions that he could not impartially judge Nika's guilt or innocence. *See* Declaration of Raymond Freeman, Petitioner's Exh. 128 (ECF No. 37-3). Regarding juror Russell Horning, this Court finds that the trial court's questioning of him, outside the presence of the jury, established that he was not biased. *See* Trial Transcript, July 5, 1995, Respondents' Exh. 39, pp. 65-70 (ECF No. 105-1, pp. 68-73).

And, beyond those two jurors, Nika makes no allegation that any of the other jurors were biased.

As for trial counsel not objecting to the prosecution's alleged removal of potential jurors on the basis of gender, based on *Batson* and *J.E.B. v. Alabama*, 511 U.S. 127 (1994), there is no colorable showing that any such objection would have been successful.

And, regarding the prosecutor's alleged improper statements concerning the presumption of innocence and alleged misstatements of law, this Court determines that the comments of the prosecution were not improper and, at any rate, were not such as to render Nika's trial unfair, and there is no showing that any objection to those statements would have been successful or would have had any effect on the outcome of the trial.

Therefore, the Court finds that Nika does not overcome the procedural default of the claims in Ground 1D, under federal law, by showing ineffective assistance of post-conviction counsel as contemplated in *Martinez.*

Turning to the claims in Grounds 9B and 9C, to the extent that Nika asserts claims of ineffective assistance of trial counsel in Grounds 9B and 9C, those claims are the same as claims asserted in Ground 1D, and they are subject to denial as procedurally defaulted as discussed above.

To the extent that, in Ground 9B, Nika asserts a substantive claim, based on the *Batson* and *J.E.B.* cases, that his constitutional rights were violated by the prosecution's removal of potential jurors based on gender, and to the extent that, in Ground 9C, Nika asserts a substantive claim of prosecutorial misconduct based on comments made by the prosecution during jury selection, no such claims were raised in Nika's first state habeas action, and, in Nika's second state habeas action, any such claims were ruled procedurally barred. *See* Second Supplemental Petition for Writ of Habeas Corpus, Respondents' Exh. 146 (ECF No. 119-1); Order of Affirmance, Respondents' Exh. 196 (ECF No. 125-4). These claims, then, are subject to denial on the ground of procedural

default, and Nika does not assert any argument that there is cause and prejudice relative to the procedural default. As these substantive claims are not claims of ineffective assistance of trial counsel, *Martinez*, is inapplicable.

Grounds 1D, 9B and 9C will, therefore, be denied on the ground of procedural default.

Nika requests discovery and an evidentiary hearing regarding Ground 9B. *See* Motion for Discovery (ECF No. 166), pp. 48-49; Motion for Evidentiary Hearing (ECF No. 168), p. 19. However, as is explained above, Ground 9B is subject to denial on the ground of procedural default, and Nika makes no argument to overcome the procedural default. Therefore, there is no good cause for the discovery and an evidentiary hearing is unwarranted; Nika's requests will be denied.

*Ground 1E - Venue*

In Ground 1E, Nika claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because "[t]rial counsel were ineffective for failing to move for a change of venue." *See* Second Amended Petition (ECF No. 73), p. 72. Nika alleges that his counsel should have moved for a change of venue because of reports in the media, before Nika's trial, about Smith's murder and about Nika, as well as media reports regarding the war in the Balkans. *See id.*

Nika asserted this claim in state court for the first time in his second state habeas action, and it was ruled procedurally barred. Nika argued that ineffective assistance of his first post-conviction counsel was cause for the procedural bar, such as to excuse it, and the Nevada Supreme Court rejected that argument, as follows:

> Nika contends that the district court erred in denying his claim that post-conviction counsel were ineffective for omitting a trial-counsel claim based on their failure to move for a change in venue. He argues that such a motion was warranted because media reports of his crime and the tensions in former Yugoslavia made it impossible for him to receive a fair trial.
>
> We conclude that Nika cannot demonstrate that postconviction counsels' omission of this trial-counsel claim was objectively unreasonable because there was no basis for trial counsel to request a change of venue. Nearly all of the veniremembers indicated that they had not seen any

news reports related to the trial, and the two veniremembers who had been exposed to media reports indicated that those reports would not influence their decision. In addition, a veniremember who indicated that she was familiar with news reports of the hostilities in Yugoslavia stated that her knowledge of those events would not affect her ability to impartially judge the facts of Nika's case. From this record it appears that the publicity was not so pernicious as to have been on the mind of every potential juror. *See Sonner v. State*, 112 Nev. 1328, 1336, 930 P.2d 707, 712-13 (1996) (noting that even where pretrial publicity has been pervasive, this court has upheld the denial of motions for change of venue where the jurors assured the district court during voir dire that they would be fair and impartial in their deliberations because, in addition to presenting evidence of inflammatory pretrial publicity, a defendant seeking a change of venue must demonstrate actual bias on the part of the empanelled jury), *modified on rehearing on other grounds by* 114 Nev. 321, 955 P.2d 673 (1998). Because there is insufficient support for the omitted trial-counsel claim, the district court did not err in denying the claim that post-conviction counsel was ineffective for omitting it. [Footnote omitted.]

Order of Affirmance, Respondents' Exh. 196, pp. 14-15 (ECF No. 125-4, pp. 15-16).

In *Hayes v. Ayers*, 632 F.3d 500 (9th Cir. 2011), the Ninth Circuit Court of Appeals set forth the law governing when a change of venue is required under the United States Constitution:

> The Sixth and Fourteenth Amendments "guarantee[ ] to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). When a trial court is "unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere[,] ... due process requires that the trial court grant defendant's motion for a change of venue." *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir.1988) (citing *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963)).
>
> In this circuit, we have identified "two different types of prejudice in support of a motion to transfer venue: presumed or actual." *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996). Interference with a defendant's fair-trial right "is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris*, 885 F.2d at 1361. Actual prejudice, on the other hand, exists when voir dire reveals that the jury pool harbors "actual partiality or hostility [against the defendant] that [cannot] be laid aside." *Id.* at 1363. The Supreme Court applied this two-pronged analytical approach in a case it decided at the end of its last term. *See Skilling v. United States*, 561 U.S. [358, 367] 130 S.Ct. 2896, 2907 (2010) (considering, first, whether pretrial publicity and community hostility established a presumption of juror prejudice, and then whether actual bias infected the jury).

* * *

72

"A presumption of prejudice" because of adverse press coverage "attends only the extreme case." *Skilling*, 130 S.Ct. at 2915; *see also Harris*, 885 F.2d at 1361 ("The presumed prejudice principle is rarely applicable and is reserved for an extreme situation." (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)) (citation and internal quotation marks omitted)).

\* \* \*

Where circumstances are not so extreme as to warrant a presumption of prejudice, we must still consider whether publicity and community outrage resulted in a jury that was actually prejudiced against the defendant. This inquiry focuses on the nature and extent of the voir dire examination and prospective jurors' responses to it. *See Skilling*, 130 S.Ct. at 2917-23. Our task is to "determine if the jurors demonstrated actual partiality or hostility [toward the defendant] that could not be laid aside." *Harris*, 885 F.2d at 1363.

*Hayes*, 632 F.3d at 507-11.

Nika appears to claim that his trial was affected by presumed prejudice, resulting from prejudicial and inflammatory pretrial reports in the media about the crime, and also about the war in the Balkans. *See* Second Amended Petition (ECF No. 73), p. 72; *see also id.* at 169-71 (Ground 10, which is incorporated by reference into Ground 1E). Nika makes no allegation in Ground 1E that any juror was actually prejudiced.

The Court determines that Nika has not shown the media coverage of Nika's crime to be anywhere near the sort necessary to give rise to presumed prejudice as recognized in *Harris* and *Skilling*. As for the media coverage of the war in the Balkans, Nika does not explain how a change of venue would have ameliorated the effect of the coverage of that story, which plainly was of national interest and presumably covered in the media throughout Nevada. Moreover, Nika does not show that the coverage of the war was such as to give rise to presumed prejudice.

Nika's first post-conviction counsel was not ineffective, within the meaning of *Martinez*, for failing to assert a claim that trial counsel was ineffective for failing to move for a change of venue, and Nika was not prejudiced. Ground 1E will be denied on procedural default grounds.

*Ground 1F3 - Trial Counsel's Opening Statement, Guilt Phase*

In Ground 1F3, Nika claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because "[t]rial counsel were ineffective during their opening arguments." *See* Second Amended Petition (ECF No. 73), pp. 78-79. Nika claims that his trial counsel were ineffective for mentioning that the case had been characterized in the media as the "Good Samaritan Killing." *See id.*; *see also* Trial Transcript, June 27, 1995, Respondents' Exh. 35, pp. 17-40 (ECF No. 101-1, pp. 20-43) (defense opening statement).

Here again, Nika asserted this claim in state court for the first time in his second state habeas action, and it was ruled procedurally barred in that case. Nika argued that ineffective assistance of his first post-conviction counsel was cause for the procedural bar, such as to excuse it, and the Nevada Supreme Court rejected that argument, as follows:

> Nika argues that the district court erred in denying his claim that post-conviction counsel were ineffective for failing to claim that trial counsel were ineffective for referring to the case as the "Good Samaritan killing" during opening statement. We disagree. Given the context of the comment (an attempt to defuse the effect of the media's characterization of the crime), the brevity of the comment, and the substantial evidence of Nika's guilt, Nika cannot demonstrate a reasonable probability of a different outcome had trial counsel not made the comment. *Cf. Thomas v. State*, 120 Nev. 37, 47, 83 P.3d 818, 825 (2004) (stating that prosecutor's statements are prejudicial when they "so infected the proceedings with unfairness as to make the results a denial of due process"). Because the omitted trial-counsel claim had no reasonable likelihood of success, we cannot fault post-conviction counsel for omitting it. The district court did not err in denying this claim.

Order of Affirmance, Respondents' Exh. 196, p. 16 (ECF No. 125-4, p. 17).

This Court finds this claim to be meritless. Nika's trial counsel's comments concerning the characterization of the killing as the "Good Samaritan Killing" were, on their face, attempts to challenge, or defuse, that view of the killing. Trial counsel's opening argument was not unreasonable. *See Strickland*, 466 U.S. at 689-90 (reasonable tactical decision by counsel with which the defendant disagrees cannot

form the basis of an ineffective assistance of counsel claim). Nika's first post-conviction counsel was not ineffective for not asserting this claim.

Ground 1F3 is procedurally defaulted, and it will be denied on that ground.

*Ground 1F4 - Spousal Privilege*

In Ground 1F4, Nika claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because "[t]rial counsel were ineffective for waiving the spousal privilege." *See* Second Amended Petition (ECF No. 73), p. 79.

With respect to this claim also, Nika asserted the claim in state court for the first time in his second state habeas action, and it was ruled procedurally barred. Nika argued in state court that ineffective assistance of his first post-conviction counsel was cause for the procedural bar, such as to excuse it, and the Nevada Supreme Court rejected that argument, as follows:

> Nika argues that the district court erred in denying his claim that post-conviction counsel were ineffective for not challenging trial counsel's waiver of Nika's spousal privilege. He claimed that but for the testimony of his wife, Rodika, the State would not have been able to prove when he left California, his reason for leaving, his mood at the time of leaving, and the fact that Nika is not very bright and prone to panic in stressful situations. We conclude that Nika failed to show that post-conviction counsel was ineffective. Rodika's direct testimony only addressed her observations of Nika's conduct and did not recount any conversations between her and Nika, therefore, the testimony would have been admissible regardless of Nika's consent. *See Contancio v. State*, 98 Nev. 22, 24-25, 639 P.2d 547, 549 (1982) (recognizing that spousal privilege under NRS 49.295(1)(b) prohibits testimony about communications made during the marriage). Further, Rodika's testimony did not incriminate Nika or prove any of the elements of first-degree murder.

Order of Affirmance, Respondents' Exh. 196, pp. 13-14 (ECF No. 125-4, pp. 14-15).

This Court agrees with the analysis of the Nevada Supreme Court. First, this Court finds it questionable whether Nika's wife's testimony could be construed as incriminating—whether the net effect of her testimony was prejudicial to Nika. But, more importantly, the Nevada Supreme Court's ruling that Nika's wife's testimony would have been admissible under NRS 49.295(1)(b), regardless of Nika's consent, is a matter of the Nevada Supreme Court's construction of Nevada law, is authoritative, and is not

subject to review in this federal habeas corpus action. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Bonin v. Calderon*, 59 F.3d 815, 841 (9th Cir. 1995). Therefore, it is plain that trial counsel was not ineffective for not asserting the privilege, and that Nika's first post-conviction counsel was not ineffective for not asserting this ineffective assistance of trial counsel claim.

Nika does not overcome the procedural default of Ground 1F4, under *Martinez*, by a showing of ineffective assistance of post-conviction counsel. Ground 1F4 will be denied on the ground of procedural default.

*Ground 1F5 - Unrecorded Bench Conferences*

In Ground 1F5, Nika claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because "[t]rial counsel were ineffective for failing to object to unrecorded bench conferences." *See* Second Amended Petition (ECF No. 73), pp. 79-80.

With respect to this claim, too, it was first presented in Nika's second state habeas action, where it was procedurally barred, and the Nevada Supreme Court ruled that Nika did not show ineffective assistance of his first post-conviction counsel such as to overcome the procedural bar:

> Nika asserts that the district court erred in denying his claim that post-conviction counsel were ineffective for failing to claim that trial counsel were ineffective for failing to object to unrecorded bench conferences. Nika failed to explain how he was prejudiced. He did not specify the subject matter of the listed bench conferences or explain their significance. *See Daniel v. State*, 119 Nev. 498, 508, 78 P.3d 890, 897 (2003). Thus, he failed to support this claim with specific facts that, if true, would entitle him to relief. *See Hargrove v. State*, 100 Nev. 498, 502, 686 P.2d 222, 225 (1984). Therefore, the district court did not err in denying this claim.

Order of Affirmance, Respondents' Exh. 196, p. 13 (ECF No. 125-4, p. 14).

This Court determines, consistent with the Nevada Supreme Court's ruling, that Nika has not shown that his first post-conviction counsel were ineffective for not asserting this claim. Nika makes no allegation or showing to indicate what was discussed in the bench conferences, or how he was prejudiced by the conferences not

1   being reported. This claim is without merit. Because Nika does not show his post-

2   conviction counsel to have been ineffective under *Martinez*, he does not overcome the

3   procedural default of the claim in Ground 1F5, and it will be denied on that ground.

4               *Ground 1F7 - Defense Closing Arguments, Guilt Phase*

5           In Ground 1F7, Nika claims that his federal constitutional rights were violated as

6   a result of ineffective assistance of his trial counsel because "[t]rial counsel were

7   ineffective during their closing arguments." *See* Second Amended Petition (ECF No.

8   73), pp. 81-89. More specifically, Nika's claim in Ground 1F7 is as follows:

9           Mr. Nika suffered prejudice from trial counsel's argument which
        caused the defense to lose even more credibility before the jury. Mr. Fox's
10      [trial counsel's] closing argument was so deficient that he ceased to be an
        advocate for Mr. Nika, and instead his argument echoed the prosecution's
11      argument for Mr. Nika's conviction. Mr. Fox began his argument by
        conceding that the instant case was a first-degree murder case and that
12      the jury should not consider a second-degree murder verdict. Mr. Fox
        commented upon Mr. Nika's failure to testify in violation of his
13      constitutional rights. Mr. Fox argued facts that were both inflammatory and
        outside of the evidence that were incriminating to Mr. Nika. Without any
14      strategic justification, Mr. Fox disparaged the victim and his wife. Mr. Fox
        told the jury that Mr. Nika was guilty of committing other inadmissible bad
15      acts that were not alleged or proven by the prosecution. Mr. Fox vouched
        for the credibility of State witnesses and spent considerable time directing
16      the jury's attention to prejudicial pre-trial publicity that was not admissible
        at Mr. Nika's trial. Singly and cumulatively, trial counsel's ineffectiveness
17      during closing argument was prejudicial.

18  *Id.* at 81.

19          Nika asserted this claim in his first state habeas action, and, on the appeal in that

20  action, the Nevada Supreme Court ruled as follows:

21          Nika argues that the district court erred by dismissing his claim that
        trial counsel's closing argument was deficient for a host of reasons and
22      that these deficiencies prejudiced him. We have carefully reviewed
        counsel's closing argument and Nika's challenges to it. Although counsel's
23      argument was at times disorganized and unfocused, we conclude that any
        deficiency in this regard did not prejudice Nika for two reasons. First,
24      strong evidence supported Nika's conviction. Second, Nika's other trial
        counsel provided a separate, subsequent closing argument, which, along
25      with the district court's admonishments to Nika's first counsel, defused
        any negative impact from the challenged closing argument. [Footnote: *See*
26      *Rudin v. State*, 120 Nev. 121, 144, 86 P.3d 572, 587 (2004).]
        Consequently, Nika failed to adequately explain that but for counsel's
27      closing argument a reasonable probability existed that he would not have
        been convicted of first-degree murder with the use of a deadly weapon.

28

                                        77

1   Therefore, we conclude that the district court did not err by summarily
    dismissing this claim.

2   *Nika*, 124 Nev. at 1292-93, 198 P.3d at 853.

3       The Court finds that the Nevada Supreme Court's adjudication of the claim was

4   not unreasonable. Much of the argument of trial counsel that Nika complains about was

5   plainly a matter of strategy, and, while Nika and reviewing courts might now, in

6   hindsight, question that strategy, the standard for finding counsel's argument to have

7   been constitutionally defective is high. Counsel has wide latitude in deciding how best to

8   represent a client, and review of counsel's representation is highly deferential, in fact,

9   "doubly deferential when it is conducted through the lens of federal habeas."

10  *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003). In view of the strong evidence against

11  Nika, and cognizant of the considerable deference mandated by *Strickland* and the

12  AEDPA, this Court determines that Nika has not shown that no reasonable jurist could

13  find that counsel's closing argument was reasonable under the circumstances, or that,

14  at any rate, Nika was not prejudiced. *See Strickland*, 466 U.S. at 689. The Court will,

15  therefore, deny Nika habeas corpus relief with respect to Ground 1F7.

16              *Grounds 1F6, 2 and 7D - Guilt Phase Jury Instructions*

17      In Ground 2, Nika claims that his federal constitutional rights were violated

18  "because the guilt phase jury instructions failed to require the jury to find all of the

19  mens rea elements of first-degree murder." *See* Second Amended Petition (ECF No.

20  73), pp. 102-10. In Ground 7D, Nika claims that his federal constitutional rights were

21  violated because "[t]he malice instructions were unconstitutional." *See id.* at 155-57. In

22  Ground 1F6, Nika claims that his federal constitutional rights were violated as a result of

23  ineffective assistance of his trial counsel because counsel failed to object to those

24  instructions. *See id.* at 80-81.

25      In Claim 2, Nika places at issue the so-called "*Kazalyn* instruction," a jury

26  instruction approved by the Nevada Supreme Court in *Powell v. State*, 108 Nev. 700,

27  838 P.2d 921 (1992), and disapproved by the same court eight years later in *Byford v.*

28  *State*, 116 Nev. 215, 994 P.2d 700 (2000). The *Kazalyn* instruction (so-called because it

was discussed by the Nevada Supreme Court in *Kazalyn v. State*, 108 Nev. 67, 825

P.2d 578 (1992)), as given in the guilt phase of Nika's trial, was as follows:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.

> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

Instructions to the Jury, Petitioner's Exh. 10, Instruction No. 28 (ECF No. 5,

p. 98). Nika argues that this instruction was unconstitutional because it collapsed three

elements of first-degree murder—"willful, deliberate and premeditated"—into one

element: "premeditated." *See* Second Amended Petition (ECF No. 73), pp. 102-10.

Nika asserted this claim in his first state habeas action. The Nevada Supreme

Court held in that case that *Byford* represented a change in Nevada's law, not a

clarification of the law, and that the *Kazalyn* instruction properly reflected the law in

cases such as Nika's, in which the conviction became final before *Byford* was decided

in 2000. *See Nika*, 124 Nev. at 1276, 1279-89, 198 P.3d at 842, 844-51.

Nika also asserted the claim in his second state habeas action, and, in that case,

the Nevada Supreme Court ruled as follows:

> Nika argues that the district court erred in denying his claim that the premeditation and deliberation instruction was improper. He contends that this court should reconsider its prior decision on this claim in light of intervening federal authority. Nika failed to demonstrate circumstances to warrant departure from the law-of-the-case doctrine. The unpublished and federal district court decisions he cites calling *Nika III*, 124 Nev. 1272, 198 P.3d 839, into doubt are not binding on this court. *See* 9th Cir. R. 36-3(a); *Blanton v. N. Las Vegas Mun. Court*, 103 Nev. 623, 633, 748 P.2d 494, 500 (1987), *aff'd*, 489 U.S. 538 (1989); *United States v. Soto-Castelo*, 621 F.Supp.2d 1062, 1069 n.2 (D. Nev. 2008), *aff'd*, 361 F.App'x 782 (9th Cir. 2010); *see also* SCR 123. Further, the cited decisions are called into doubt by the Ninth Circuit's recent decision in *Babb v. Lazowsky*, 719 F.3d 1019 (9th Cir. 2013), *cert. denied*, ___ U.S. ___, 134 S.Ct. 526 (2013), which disapproved of the holding in *Polk v. Sandoval*, 503 F.3d 903 (9th Cir. 2007), and noted its effective overruling by *Nika III*. *Babb*, 719 F.3d at 2019-30. Nika has not cited any controlling authority that would warrant reconsideration of this claim.

Order of Affirmance, Respondents' Exh. 196, pp. 23-24 (ECF No. 125-4, pp. 24-25).

In *Polk v. Sandoval*, 503 F.3d 903 (9th Cir. 2007), which was decided before the Nevada Supreme Court ruled on the appeal in Nika's first state habeas action, the Ninth Circuit Court of Appeals held that the *Kazalyn* instruction was unconstitutional because it relieved the State "of its burden of proving every element of first-degree murder beyond a reasonable doubt." *Polk*, 503 F.3d at 909. Subsequently, however, in *Babb v. Lozowsky*, 719 F.3d 1019 (9th Cir. 2013), decided after Nika's first habeas action was completed, the court determined that its holding in *Polk* is no longer good law in light of the intervening Nevada Supreme Court decision in Nika's case. *See Babb*, 719 F.3d at 1029. In light of *Babb*, and other subsequent decisions of the Ninth Circuit Court of Appeals, it has now become well-established that in cases like this one, in which the conviction became final after the *Powell* decision but prior to the *Byford* decision—that is, between 1992 and 2000—the *Kazalyn* instruction accurately stated Nevada law and did not violate the defendant's federal constitutional rights. *See Babb*, 719 F.3d at 1029-30; *see also Riley v. McDaniel*, 786 F.3d 719 (9th Cir. 2015); *Moore v. Helling*, 763 F.3d 1011 (9th Cir. 2014).

The Nevada Supreme Court's holding that *Byford* represented a change in Nevada law is a ruling by the state supreme court on a question of state law, not subject to review in this federal habeas corpus action. *See Estelle*, 502 U.S. at 67-68; *Bonin*, 59 F.3d at 841. Nika's conviction became final on January 21, 1998, when the Nevada Supreme Court issued its remittitur after affirming his conviction on direct appeal. *See* Remittitur, Respondents' Exh. 84 (ECF No. 112-3). That was after *Powell* and before *Byford*. Nika's claim is, therefore, foreclosed by the holding in *Babb*. The instruction he challenges was not unconstitutional. The Nevada Supreme Court's ruling on the claim in Ground 2 was not contrary to, or an unreasonable application of, Supreme Court precedent and was not based on an unreasonable determination of the facts in light of the evidence.

Turning to Ground 1F6, regarding trial counsel's failure to object to the *Kazalyn* instruction, the Nevada Supreme Court ruled, in Nika's first state habeas action, that

Nika's trial counsel had no basis upon which to object to the *Kazalyn* instruction, as it represented a correct statement of the law at the time of Nika's trial, and, therefore, Nika's trial counsel was not ineffective, under *Strickland*. That ruling was not unreasonable.

In Ground 2, Nika incudes several other claims, asserting other theories that the *Kazalyn* instruction violated his constitutional rights: for example, that the instruction violated his constitutional right to equal protection under the law, that the instruction invited arbitrary and capricious application of the death penalty, and that the instruction had the effect of relieving the State of the burden of proof on the question of his state of mind. *See* Second Amended Petition (ECF No. 73), pp. 104-07. These theories, though, were not asserted in Nika's first state habeas action. *See* Second Supplemental Petition for Writ of Habeas Corpus, Respondents' Exh. 146, pp. 50-54 (ECF No. 119-1, pp. 51-55); Appellant's Opening Brief, Respondents' Exh. 152, pp. 36-41 (ECF No. 120-5, pp. 55-60). These claims are, therefore, procedurally defaulted, and Nika makes no argument that he can overcome that procedurally default, so they will be denied on that ground. Alternatively, assuming, for the purpose of analysis, that Nika's arguments in state court did encompass these theories, the Nevada Supreme Court's denial of the claims was not an unreasonable application of *Bunkley v. Florida*, 538 U.S. 835 (2003); *Schriro v. Summerlin*, 542 U.S. 348 (2004); *Village of Willowbrook v. Olech,* 528 U.S. 562 (2000); *Stringer v. Black*, 503 U.S. 222 (1992); *Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985); *Francis v. Franklin*, 471 U.S. 307 (1985); *Sandstrom v. Montana*, 442 U.S. 510 (1979); *In re Winship*, 397 U.S. 358 (1970); or any other United States Supreme Court precedent cited by Nika.

In Ground 7D, Nika claims that the following jury instructions, regarding "malice" were unconstitutional:

> Murder is the unlawful killing of a human being, with malice aforethought, either express or implied. The unlawful killing may be effected by any of the various means by which death may be occasioned.

\*   \*   \*

NRS 200.020 defines malice, express and implied, as follows:
1. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.

2. Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.

Instructions to the Jury, Petitioner's Exh. 10, Instructions No. 22, 24 (ECF No. 5, pp. 92, 94). Specifically, Nika claims that the second provision of Instruction No. 24 ("Malice shall be implied ...") imposes an impermissible mandatory presumption and renders the instructions unconstitutional. *See* Second Amended Petition (ECF No. 73), pp. 155-57. And, in Ground 1F6, Nika claims that his trial counsel was ineffective for not objecting to these instructions. *See id.* at 81.

In his first state habeas action, Nika asserted this claim, as well as a claim that his trial counsel was ineffective for not objecting to the malice instructions, and, on the appeal in that action, the Nevada Supreme Court ruled as follows:

Nika contends that the district court erred by dismissing his claim that trial counsel were ineffective for failing to object to the jury instruction defining malice, which provided the statutory definitions of express and implied malice. [Footnote: NRS 200.202.] In particular, Nika asserts that the instruction inadequately defined malice aforethought and created a mandatory presumption of implied malice, allowing the jury to find malice solely on the basis that the jurors believed he was a bad person. We rejected a similar challenge to this malice instruction in *Cordova v. State* and specifically approved its use. [Footnote: 116 Nev. 664, 666-67, 6 P.3d 481, 483 (2000).] Nika acknowledges *Cordova* but argues that the decision in that case represents an unreasonable application of federal constitutional law. However, he advances no persuasive reason to depart from *Cordova*, Because Nika failed to show deficient performance or prejudice, we conclude that the district court did not err by summarily dismissing this claim.

*Nika*, 124 Nev. at 1289-90, 198 P.3d at 851.

The Nevada Supreme Court's denial of relief on these claims was reasonable. Both the claim of trial court error and the claim of trial counsel error fail because Nika cannot show that the implied malice instruction had any impact on the outcome of his trial. The jury found Nika guilty of first-degree murder. The instructions given to the jury defined first degree murder as "any kind of willful, deliberate and premeditated killing."

Instructions to the Jury, Petitioner's Exh. 10, Instruction No. 23 (ECF No. 5, pp. 93). Because the jury must have determined that the killing was willful, deliberate, and premeditated, the jury necessarily determined that Nika had the deliberate intention to kill, thus establishing express malice. *See Ficklin v. Hatcher*, 177 F.3d 1147, 1151 (9th Cir. 1999). Therefore, the Nevada Supreme Court's ruling on these claims was not contrary to, or an unreasonable application of, Supreme Court precedent and was not based on an unreasonable determination of the facts in light of the evidence.

The Court will deny Nika habeas corpus relief with respect to Grounds 1F6, 2 and 7D

*Ground 4B - Samantha McKendall*

In Ground 4B, Nika claims that his federal constitutional rights were violated because "[t]he State committed misconduct by preventing the defense from calling Samantha McKendall." *See* Second Amended Petition (ECF No. 73), pp. 126-27.

Nika asserted this claim in his second state habeas action, but not in his first state habeas action, so it is procedurally defaulted, and subject to denial on that ground, unless Nika can make a showing to overcome the procedural default. *See* Order entered March 16, 2017 (ECF No. 151), p. 9. Nika argues that there is cause for the procedural default, such that it may be overcome, because of the State's suppression of evidence related to the claim. *See id*.

The evidence proffered by Nika shows that McKendall, who worked with the victim, Smith, at a Reno Burger King restaurant, gave a written statement to the police a few days after Smith was killed. In that statement, McKendall wrote that Smith had mentioned that he had a gun in his car. *See* Petitioner's Exh. 28 (ECF No. 7-2). A defense investigator contacted McKendall on December 1, 1994, and, according to a memorandum written by the investigator to trial counsel, McKendall told the investigator the following:

> McKendall [stated] that Smith told her of his weapon, a 44 caliber the night before his death. The conversation resulted from her interest in whether he was afraid to travel back and forth at night. McKendall

indicated that his was the only time she spoke with Smith about the weapon, and that she never saw it. Although McKendall believes Smith stated he had a 44, she is not positive. She is sure Smith said it was a "forty something Caliber."

Petitioner's Exh. 121 (ECF No. 36-2, p. 12.) In that memorandum, the investigator wrote an address and three telephone numbers for McKendall. *See id.* On June 7, 1995, the defense investigator attempted to contact McKendall at her last-known workplace, the Burger King restaurant where she worked with Smith, to serve a subpoena on her, and he wrote the following about that attempt:

> I was advised by Kim Uffman, Mgr., that Samantha no longer works there, and is in California, whereabouts unknown. According to Uffman, she has been trying to contact McKendall in California for the last week. Uffman also stated that McKendall's parents don't know how to contact McKendall either, and have contacted her seeking information with which to contact her. Uffman took my card and stated that if she is in contact with McKendall, she will give her a message to contact me.

> On the same date, I telephoned Affordable Bus & Coach ... and spoke with Mrs. McKendall, Samantha's mother. Mrs. McKendall indicated that Samantha has been in California and is expected back in Reno on 6-8-95.

> Mrs. McKendall indicated that she is not [at] liberty to inform me of how Samantha can be located, but stated that Cindy Wyett, DA Investigator has been advised of information with which to contact Samantha McKendall. Mrs. McKendall took my name and phone number and stated that she would ask [Samantha] to contact me upon her return to Reno.

*Id.* (ECF No. 36-2, p. 29). Also, Nika states in his petition that the defense was provided a pager number for McKendall. *See* Second Amended Petition (ECF No. 73), p. 127 ("Though the investigator was eventually provided with Ms. McKendall's pager number ...."). Then, in a declaration signed by McKendall on June 16, 2009, she states:

> At the time of the trial, I was living in California. They paid me to come back to Reno to testify. I remember the trip vividly because at one point or another during the trip, all four of my tires went flat. They paid for me to stay in Reno for a week, but I never ended up testifying because they told me that the person who killed Smitty had received diplomatic immunity. I did not know exactly what that meant, but my impression was they never even had a trial in his case.

Declaration of Samantha McKendall, Petitioner's Exh. 88, ¶ 4 (ECF No. 22-5, p. 2).

With this factual background, Nika's argument that he can overcome the procedural default, because of suppression of evidence by the State, is as follows:

84

> Nika can overcome the alleged procedural default of this claim based on the State's suppression of the evidence. *Strickler v. Greene*, 527 U.S. 263, 282 (1999). Nika has demonstrated good cause under *Strickler* and *Banks* based on the State's failure to disclose McKendall's knowledge about the victim's gun and its active suppression of her whereabouts when it knew Nika's lawyer and investigator were looking for her. Nika has also demonstrated that he was prejudiced by this suppression: if the jury had heard McKendall's testimony, it would have supported Nika's claim that the victim provoked the incident that lead to his death, or at least that the victim was the one who originally produced the gun during the altercation.

Reply (ECF No. 169), p. 269.

The Court determines that Nika has not shown cause and prejudice, such as to overcome the procedural default. Nika does not make any allegation as to why McKendall could not be found, and her declaration obtained, before 2009, and in time to assert a claim such as this in his first state habeas action. Nika makes no allegation that the State hindered Nika from locating McKendall between the time of the trial and the conclusion of his first state habeas action in 2008. To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule." *Murray*, 477 U.S. at 488; *McCleskey*, 499 U.S. at 497. Nika does not make such a showing. Ground 4B will be denied on the ground of procedural default.

Nika requests discovery and an evidentiary hearing regarding Ground 4B. *See* Motion for Discovery (ECF No. 166), pp. 40-47; Motion for Discovery (ECF No. 168), pp. 6-7. However, neither the discovery nor the evidentiary hearing that Nika seeks with respect to this claim is related to the issue of the procedural default. Neither would have any effect on the Court's denial of the claim on procedural default grounds. The requests for discovery and an evidentiary hearing regarding this claim will be denied.

*Ground 9A - Prosecution Arguments*

In Ground 9A, Nika claims that the prosecutor made improper arguments in closing argument in both the guilt phase and penalty phase of his trial, and that his trial counsel was ineffective for failing to object to those arguments. *See* Second Amended Petition (ECF No. 73), pp. 162-64. In particular, Nika claims that, in the guilt phase of

his trial, the prosecutor made arguments disparaging his trial counsel, and, in the penalty phase of his trial, the prosecutor made arguments asking the jury to send a message to the community, minimizing the jury's responsibility for the verdict, and shifting the burden of proof. *See id.*

Nika raised these claims in state court for the first time in his second state habeas action. The claims were ruled procedurally barred in that action. The Nevada Supreme Court rejected Nika's argument that he could show cause and prejudice to overcome the procedural bars on account of ineffective assistance on his direct appeal and in his first state habeas action:

> Nika contends that the district court erred in denying his claim that post-conviction counsel were ineffective for failing to claim that trial and appellate counsel were ineffective for failing to argue that the State committed prosecutorial misconduct during its arguments. We conclude these arguments lack merit for the reasons discussed below.
>
> * * *
>
> Nika argues that post-conviction counsel should have raised a claim that trial counsel were ineffective in failing to object when the prosecutor disparaged defense counsel in stating that the defense "doesn't know the significance of the evidence," made mistakes in assessing the evidence, and made numerous suppositions. We disagree. Although a prosecutor may not "disparage defense counsel or legitimate defense tactics," *Browning v. State*, 124 Nev. 517, 534, 188 P.3d 60, 72 (2008); *see Butler v. State*, 120 Nev. 879, 898, 102 P.3d 71, 84 (2004), the prosecutor merely responded to arguments made and inferences drawn by the defense concerning the facts in evidence and were therefore not objectionable. Because the comments were not objectionable, post-conviction counsel could not have used them as a basis to challenge trial or appellate counsel's effectiveness. *Epps v. State*, 901 F.2d 1481, 1483 (9th Cir. 1990).
>
> * * *
>
> Nika argues that post-conviction counsel should have claimed that trial counsel were ineffective in failing to object when the prosecutor asked the jury to vote for death to send a message to the community. We disagree. "[A] prosecutor in a death penalty case properly may ask the jury, through its verdict, to set a standard or make a statement to the community." *Williams v. State*, 113 Nev. 1008, 1020, 945 P.2d 438, 445 (1997), *overruled on other grounds by Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000). As the comment was not objectionable, it could not be the basis for a claim of ineffective assistance of trial, appellate, or post-conviction counsel. *Epps*, 901 F.2d at 1483. Therefore, the district court did not err in denying this claim.

* * *

Nika argues that post-conviction counsel should have claimed that trial counsel were ineffective in failing to object to comments he contends shifted the burden of proof and implied that the jurors were not personally responsible for the verdict. However, the comments about which Nika complains were fair responses to defense arguments. Because the comments were not objectionable, they could not form the basis for an ineffective assistance of trial, appellate, or post-conviction counsel. *Id.* Therefore, the district court did not err in denying this claim.

Order of Affirmance, Respondents' Exh. 196, pp. 16-18 (ECF No. 125-4, pp. 17-19).

A prosecutor's improper remarks render a conviction unconstitutional if they so infect the trial with unfairness as to make the resulting conviction a denial of due process. *Parker v. Matthews*, 567 U.S. 45, 48 (2012) (per curiam); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Comer v. Schriro*, 480 F.3d 960, 988 (9th Cir. 2007). The ultimate question is whether the alleged misconduct rendered the trial fundamentally unfair. *Darden*, 477 U.S. at 183. In determining whether a prosecutor's arguments rendered a trial fundamentally unfair, a court must judge the remarks in the context of the entire trial. *See Boyde v. California*, 494 U.S. 370, 385 (1990); *Darden*, 477 U.S. at 179-82. In considering the effect of improper prosecutorial argument, the court considers whether the trial court instructed the jury that its decision is to be based solely upon the evidence, whether the trial court instructed the jury that counsel's remarks are not evidence, whether the defense objected, whether the comments were "invited" by the defense, and whether there was overwhelming evidence of guilt. *See Darden*, 477 U.S. at 182.

Regarding the substantive claims of prosecutorial misconduct in Ground 9A—the claims that Nika's constitutional rights were violated by the prosecution arguments—those claims are subject to the procedural default doctrine, and Nika has not made any showing to overcome the procedural default. *See* Reply (ECF No. 169), pp. 269-74. Those claims in Ground 9A will be denied on procedural default grounds.

Regarding the claims of ineffective assistance of trial counsel in Ground 9A—the claims that trial counsel was ineffective for failing to object to the alleged improper prosecution arguments—*Martinez* offers a possible means of overcoming the

procedural default of those claims, but this Court finds that Nika does not meet the standard set by *Martinez* to allow consideration of the claims on their merits. This Court finds that, in large part, the arguments Nika complains of were not improper, and were, at any rate, invited by arguments made by defense counsel. Furthermore, the arguments, considered individually and cumulatively, and in the context of the entire trial, were not such as to approach the threshold set in *Darden* and *Parker*. The arguments that Nika complains of did not render his trial unfair. Nika's trial counsel were not ineffective for failing to object to the prosecution arguments, and Nika's first post-conviction counsel were not ineffective for failing to make these claims of ineffective assistance of trial counsel. The ineffective assistance of trial counsel claims in Ground 9A will be denied on procedural default grounds.

*Grounds 1A, 1B and 1H—Other Claims Regarding Trial Counsel*

In Ground 1A, Nika claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because "[t]he county contract under which trial counsel were paid created a conflict of interest that prevented trial counsel from performing effectively." *See* Second Amended Petition (ECF No. 73), pp. 10-13.

Nika raised this claim for the first time in state court in his second state habeas action. The Nevada Supreme Court ruled the claim to be procedurally barred, and ruled, as follows, that Nika did not show ineffective assistance of his first post-conviction counsel, such as to overcome the procedural bar under state law:

> Nika argues that the district court erred in denying his claim that post-conviction counsel were ineffective for failing to discover a conflict of interest based on defense counsel's reimbursement contract. He alleges that the contract created a conflict of interest because it pitted the appointed attorney's interest in compensation against the need to spend funds on investigative services for the client, and that had this conflict not existed, trial counsel would have hired a mental health expert to evaluate Nika and testify at the penalty hearing. As discussed above, Nika failed to demonstrate a reasonable probability that the evidence developed by the mental health expert would have altered the outcome of the penalty hearing. Thus, Nika also failed to meet the prejudice prong of his post-conviction-counsel claim.

Order of Affirmance, Respondents' Exh. 196, p. 6 (ECF No. 125-4, p. 7).

This Court finds that Nika has not shown that his first post-conviction counsel were ineffective, within the meaning of *Martinez*, for failing to assert this claim. Nika has not made allegations sufficient to show that any conflict of interest adversely affected his trial counsel's performance. *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *see also Earp v. Ornoski*, 431 F.3d 1158, 1184 (9th Cir. 2005). Nika's claim regarding the effect of the terms of the contract between the county and Jack Alian on the performance of trial counsel, Ohlson and Fox, are purely speculative. As Nika's allegations, regarding the contract under which Ohlson and Fox worked, and its effect on their representation of Nika, falls short of showing a conflict that affected their work, Nika does not show that his first post-conviction counsel were ineffective for not raising this claim, such as to overcome the procedural default. Ground 1A will be denied on procedural default grounds.

Nika seeks to conduct discovery regarding Ground 1A. *See* Motion for Discovery (ECF No. 166), pp. 8-14. However, as the Court finds this claim to be insubstantial, there is no showing of good cause for the discovery he seeks. The motion for leave to conduct discovery regarding this claim will be denied.

In Ground 1B, Nika claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because "[t]rial counsel were ineffective for failing to investigate and present compelling evidence of Mr. Nika's background, culture, and life history." *See* Second Amended Petition (ECF No. 73), pp. 13-53. The Court will deny this claim because it is repetitive of other, more specific, claims in Nika's second amended petition, most notably, claims in Grounds 1C, 1F1, 1G and 6. In considering the other claims asserted in Nika's second amended petition, including the claims in Grounds 1C, 1F1, 1G and 6, the Court takes into consideration the allegations in Ground 1B.

Nika requests discovery and an evidentiary hearing regarding Ground 1B. *See* Motion for Discovery (ECF No. 166), pp. 14-24; Motion for Evidentiary Hearing (ECF No. 168), p. 5. However, because the Court finds that this claim is redundant of other,

more specific claims, asserted by Nika, the Court denies this request and considers his requests for discovery and an evidentiary hearing in conjunction with the other claims, as is discussed above.

In Ground 1H, Nika claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel because "[t]rial counsel were ineffective throughout the trial proceedings." *See* Second Amended Petition (ECF No. 73), pp. 95-99. In this ground, Nika includes claims that his trial counsel were ineffective: for "refusing to engage in plea discussions with the State" and for "failure to communicate the potential of a plea bargain" to Nika, for advising Nika to waive his right to allocution, for "failing to adequately litigate the issue of Mr. Nika's lack of criminal history," for "failing to request instructions explaining to the jury that the prior bad act evidence had to be proven beyond a reasonable doubt, that it could not be considered in support of any of the aggravators, and that it could only be considered once the jury had determined that the statutory aggravators outweighed the mitigators," for ineffectively cross-examining the victim's wife and daughter, for failing to object to improper jury instructions, for presenting ineffective closing argument in the penalty phase of the trial, and for failing to object to improper arguments of the prosecutor in closing argument in the penalty phase of the trial. *See id.*

The Court finds that the claims in Ground 1H are, to some extent, repetitive of other claims made elsewhere in Nika's second amended petition and discussed above, and are asserted in a *pro forma* manner and unsupported by any evidence proffered by Nika. Moreover, to the extent they are subject to the procedural default doctrine, Nika has made no showing that his first post-conviction counsel were ineffective in not asserting these claims. Ground 1H will be denied.

*Ground 14 - Nevada's Lethal Injection Protocol*

In Ground 14, Nika claims that his death sentence is in violation of the federal constitution "because Nevada's lethal injection scheme constitutes cruel and unusual punishment." *See* Second Amended Petition (ECF No. 73), pp. 179-96. As the Court

understands Claim 14, Nika asserts that lethal injection, conducted in the manner in which Nevada authorities intend to conduct it in Nika's case, would be unconstitutional. *See id.*

Such a challenge to Nevada's protocol for carrying out a death sentence is not cognizable in this federal habeas corpus action. In *Nelson v. Campbell*, 541 U.S. 637 (2004), a state prisoner sentenced to death filed a civil rights action, under 42 U.S.C. § 1983, alleging that the state's proposed use of a certain procedure, not mandated by state law, to access his veins during a lethal injection would constitute cruel and unusual punishment. The Supreme Court reversed the lower courts' ruling that the claim sounded in habeas corpus and could not be brought as a Section 1983 action. The Supreme Court ruled that Section 1983 was an appropriate vehicle for the prisoner to challenge the lethal injection procedure prescribed by state officials. *Nelson*, 541 U.S. at 645. The Court stated that the prisoner's suit challenging "a particular means of effectuating a sentence of death does not directly call into question the 'fact' or 'validity' of the sentence itself [because by altering the lethal injection procedure] the State can go forward with the sentence." *Id.* at 644. In *Hill v. McDonough*, 547 U.S. 573 (2006), the Court reaffirmed the principles articulated in *Nelson*, ruling that an as-applied challenge to lethal injection was properly brought by means of a Section 1983 action. *Hill*, 547 U.S. at 580-83.

*Nelson* and *Hill* suggest that a Section 1983 claim is the more appropriate vehicle for such a challenge to a method of execution. *See also Glossip v. Gross*, 135 S.Ct. 2726, 2738 (2015) ("In *Hill*, the issue was whether a challenge to a method of execution must be brought by means of an application for a writ of habeas corpus or a civil action under § 1983. We held that a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence." (citations to *Hill* omitted)); *Beardslee v. Woodford*, 395 F.3d 1064, 1068-69 (9th Cir. 2005) (holding that claim that California's lethal injection protocol violated Eighth Amendment "is more properly considered as a 'conditions of confinement'

challenge, which is cognizable under § 1983, than as a challenge that would implicate the legality of his sentence, and thus be appropriate for federal habeas review").

Given the amount of time that passes before a death sentence is carried out, it is certainly possible—perhaps likely—that a state's execution protocol will change between the time when a death sentence is imposed and the time when it is carried out. See, *e.g.*, Reply (ECF No. 169), pp. 277-78 (explaining that Nevada's lethal injection protocol changed between the filing of Nika's second amended habeas petition, and the filing of his reply to Respondents' answer). Habeas corpus law and procedure have not developed and are unsuited to adjudicate the constitutionality of an execution protocol that may change after a court imposes the death sentence. The Court concludes that a challenge to a state's execution protocol is not a challenge to the constitutionality of the petitioner's custody or sentence. *See* 28 U.S.C. § 2254. A challenge to a state's execution protocol is more akin to a suit challenging the conditions of custody, which must be brought as a civil rights action under 42 U.S.C. § 1983. Therefore, Ground 14 will be denied as not cognizable in this federal habeas corpus action.

*Grounds 7H and 13—Cumulative Error Claims*

Grounds 7H and 13 of Nika's petition are cumulative error claims, that is, they are claims that incorporate other claims, and assert that, considered cumulatively, the errors alleged in Nika's other claims warrant federal habeas corpus relief. *See* Second Amended Petition (ECF No. 73), pp. 159, 177-78. Ground 7H is a cumulative error claim regarding Nika's claims of instructional error, and Ground 13 is a cumulative error claim regarding all Nika's other claims. *See id.*

The Court denies Nika relief with respect to Grounds 7H and 13, per se, as the Court does not understand these to be viable stand-alone claims.

Furthermore, with respect to Ground 7H, the claim of cumulative error concerning Nika's various claims of instructional error, the Court found instructional error as claimed by Nika in only Ground 7B; therefore, there are not multiple instances of instructional error to consider cumulatively.

92

And, with respect to Ground 13, Nika's claim of cumulative error covering all his

claims, the Court finds constitutional error as alleged by Nika in Grounds 1G, 6 and 7B,

and has considered the effect of those errors cumulatively, as is discussed above.

<u>Nika's Motions for Leave to Conduct Discovery and for an Evidentiary Hearing</u>

Nika has filed a motion for leave to conduct discovery (ECF No. 166) and a

motion for an evidentiary hearing (ECF No. 168).

Respondents oppose both motions on the ground that they are similar to motions

for leave to conduct discovery and for an evidentiary hearing that Nika filed in

conjunction with his opposition to a motion to dismiss. *See* Opposition to Motion for

Leave to Conduct Discovery and Motion for Evidentiary Hearing (ECF No. 172). That

argument in opposition to Nika's motions is without merit. The March 16, 2017, order

stated explicitly that the motions for leave to conduct discovery and for an evidentiary

hearing were denied without prejudice to Nika requesting discovery or an evidentiary

hearing at the appropriate time in conjunction with the further briefing of the merits of his

remaining claims. *See* Order entered March 16, 2017 (ECF No. 151), p. 13; *see also*

Scheduling Order entered June 18, 2015 (ECF No. 68).

In his motion for leave to conduct discovery, Nika requests leave of court to

conduct discovery with respect to Grounds 1A, 1B, 1C, 1F1, 1F2, 1G, 4A, 4B, 5 and 9B.

*See* Motion for Discovery (ECF No. 166). A habeas petitioner does not have a

presumptive right to discovery; rather discovery is available in a habeas action, in the

discretion of the court, if good cause is shown. *See Bracy v. Gramley*, 520 U.S. 899

(1997); *Smith v. Mahoney*, 611 F.3d 978, 996-97 (9th Cir. 2010); *Rich v. Calderon*, 187

F.3d 1064, 1068 (9th Cir. 1999) (as amended) ("discovery is available only in the

discretion of the court and for good cause shown"); *see also* Rule 6 of the Rules

Governing Section 2254 Cases in the United States District Courts. As is discussed

above, the Court denies relief on Grounds 1A, 1B, 1C, 1F1, 1F2, 4A, 4B, 5 and 9B, and

finds there is no showing of good cause for discovery as to those claims. And, regarding

Ground 1G, the Court grants Nika relief on that claim without need for further factual

development. Therefore, the Court will deny Nika's motion for leave to conduct

discovery.

In his motion for evidentiary hearing, Nika appears to request an evidentiary

hearing regarding Grounds 1B, 1C, 1F1, 1G, 4B, 6 and 9B. *See* Motion for Evidentiary

Hearing (ECF No. 168). The general standard for holding an evidentiary hearing in a

federal habeas action is governed by 28 U.S.C. § 2254:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> > (A) the claim relies on—
> >
> > > (1) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (2) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). Evidentiary hearings are not authorized for claims adjudicated

on the merits in the state court. *Pinholster*, 563 U.S. at 183-84. The court denies relief

on Grounds 1B, 1C, 1F1, 4B, 6 and 9B, and, as is discussed above, determines that an

evidentiary hearing is not warranted with respect to any of those claims. The Court

grants relief relative to Ground 1G without need for an evidentiary hearing. The Court

will, therefore, deny Nika's motion for an evidentiary hearing.

Certificate of Appealability

The standard for the issuance of a certificate of appealability requires a

"substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c). The

Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district

court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where, as here, the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000).

The Court finds that, with respect to the claims on which the Court denies Nika relief, applying the standard articulated in *Slack*, a certificate of appealability is warranted with respect to Grounds 1C, 3, 4A and 5. The Court will grant Nika a certificate of appealability with regard to those claims. With regard to the remainder of the claims on which the Court denies Nika relief, the Court will deny him a certificate of appealability.

Conclusion

**IT IS THEREFORE ORDERED** that the Petitioner's Second Amended Petition for Writ of Habeas Corpus (ECF No. 73) is **GRANTED IN PART AND DENIED IN PART**. Petitioner is granted relief relative to the penalty phase of his trial, as described below, with respect to his claims in Grounds 1G, 6 (the ineffective assistance of trial counsel claim in Ground 6, as to the penalty phase of his trial), and 7B. Petitioner is denied relief on all other claims in his second amended habeas petition.

**IT IS FURTHER ORDERED** that Respondents shall either (1) within 60 days from the date of this order, vacate Petitioner's death sentence and impose upon him a non-capital sentence, consistent with law, or (2) within 60 days from the date of this order, file a notice of the State's intent to grant Petitioner a new penalty-phase trial, and, within 180 days from the date of this order, commence jury selection in the new penalty-phase trial.

**IT IS FURTHER ORDERED** that Petitioner's Motion for Discovery (ECF No. 166) and Motion for Evidentiary Hearing (ECF No. 168) are **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner is granted a certificate of appealability with respect to his claims in Grounds 1C, 3, 4A and 5 of his Second Amended Petition for Writ of Habeas Corpus (ECF No. 73). With respect to all other claims in Nika's second amended habeas petition on which the Court denies relief, the Court denies a certificate of appealability.

**IT IS FURTHER ORDERED** that the judgment in this action will be stayed pending the conclusion of any appellate or certiorari review in the Ninth Circuit Court of Appeals or the United States Supreme Court, or the expiration of the time for seeking such appellate or certiorari review, whichever occurs later.

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that, pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of the Court shall, on the docket for this case, substitute William Gittere for Timothy Filson, as the respondent warden, and Aaron Ford for Adam Laxalt, as the respondent Nevada Attorney General.

DATED June 12, 2019.

JAMES C. MAHAN,
UNITED STATES DISTRICT JUDGE